RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0205p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NORTHLAND FAMILY PLANNING CLINIC, INC.;
NORTHLAND FAMILY PLANNING CLINIC, INC. -
WEST; NORTHLAND FAMILY PLANNING CLINIC, INC.
- EAST; SUMMIT MEDICAL CENTER, INC.; PLANNED
PARENTHOOD OF MID-MICHIGAN ALLIANCE;
PLANNED PARENTHOOD OF SOUTH CENTRAL
MICHIGAN; STANLEY M. BERRY; TIMOTHY R.B.
JOHNSON; KAROLINE S. PUDER; RONALD C.
STRICKLER,

>    Nos. 05-2417/2418

       *Plaintiffs-Appellees,*

   *v.*

MICHAEL A. COX, Attorney General of the State of
Michigan,

       *Defendant-Appellant (05-2418),*

KIM L. WORTHY, Prosecuting Attorney for Wayne
County,

       *Defendant,*

STANDING TOGETHER TO OPPOSE PARTIAL-BIRTH-
ABORTION,

    *Proposed Intervenor-Appellant (05-2417).*

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-70779—Denise Page Hood, District Judge.

Argued: October 26, 2006

Decided and Filed: June 4, 2007

Before: MARTIN and COOK, Circuit Judges; BUNNING, District Judge.[*]

---

[*] The Honorable David L. Bunning, United States District Judge for the Eastern District of Kentucky, sitting by designation.

---

**COUNSEL**

**ARGUED:** Robert Joseph Muise, THOMAS MORE LAW CENTER, Ann Arbor, Michigan, B. Eric Restuccia, OFFICE OF THE ATTORNEY GENERAL, APPELLATE DIVISION, Lansing, Michigan, for Defendants. Brigitte Amiri, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Plaintiffs. **ON BRIEF:** Robert Joseph Muise, THOMAS MORE LAW CENTER, Ann Arbor, Michigan, B. Eric Restuccia, OFFICE OF THE ATTORNEY GENERAL, APPELLATE DIVISION, Lansing, Michigan, Ronald J. Styka, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan, for Defendants. Brigitte Amiri, S. Talcott Camp, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, Sanford M. Cohen, CENTER FOR REPRODUCTIVE RIGHTS, New York, New York, Michael J. Steinberg, Kary L. Moss, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, Detroit, Michigan, for Plaintiffs. Denise M. Burke, Mailee R. Smith, AMERICANS UNITED FOR LIFE, Chicago, Illinois, Kurt G. Calia, COVINGTON & BURLING, Washington, D. C., for Amici Curiae.

---

**OPINION**

---

BOYCE F. MARTIN, JR., Circuit Judge. The Michigan Attorney General appeals the district court's decision declaring unconstitutional a state law that regulates abortion methods. Because we find that Michigan's law fails to comply with the explicit limitations that the Supreme Court has established for statutes regulating abortion, we agree with the district court's disposition, and affirm.

I.

In 2004, after a proposal by a citizen initiative petition, the Michigan Legislature passed the Legal Birth Definition Act. The purpose of the Act was to prohibit the practice colloquially referred to as partial-birth abortion. The Act does not on its own terms ban any specific type of abortion procedure. Instead it creates a protected legal status for a partially-delivered fetus that it terms a "perinate." Mich. Comp. Laws § 333.1083(1) ("A perinate shall be considered a legally born person for all purposes under the law."). A perinate is defined by the Act as "a live human being at any point after which any anatomical part of the human being is known to have passed beyond the plane of the vaginal introitus until the point of complete expulsion or extraction from the mother's body." Mich. Comp. Laws § 333.1085(d). The Act provides civil and criminal immunity for physicians who perform procedures that result in the injury or death of a perinate where the perinate is "expelled from the mother's body as a result of a spontaneous abortion," as well as in circumstances where:

> in that physician's reasonable medical judgment and in compliance with the applicable standard of practice and care, the procedure was necessary in either of the following circumstances:
> (i) To save the life of the mother and every reasonable effort was made to preserve the life of both the mother and the perinate.
> (ii) To avert an imminent threat to the physical health of the mother, and any harm to the perinate was incidental to treating the mother and not a known or intended result of the procedure performed.

Mich. Comp. Laws § 333.1083.  As the state acknowledges, "the practical effect of the [Act] on abortion procedures is that any physician who performs an abortion that results in the injury or death of a 'perinate' would be subject to criminal prosecution unless excused by the life or health exceptions."  Appellant's Br. at 6.

The plaintiffs in this case — six health care facilities and four obstetrician-gynecologists — filed suit on March 1, 2005, prior to the March 30, 2005 effective date of the Act.  They sought declaratory and permanent injunctive relief, and moved simultaneously for a preliminary injunction to prevent enforcement of the Act during the pendency of the litigation.  Two weeks after the complaint was filed, the parties stipulated to a Temporary Restraining Order until the district court could rule on the motion for preliminary injunction.  The Michigan Attorney General subsequently issued an opinion purporting to limit the scope of the Act.  The opinion provides that in light of federal case law, the Act "has the effect of banning, with certain exceptions, those dilation and extraction (D&X) abortion procedures that require the killing of a 'perinate' as defined in the Act. The [Act] does not have the effect of banning the dilation and evacuation (D&E) procedures."  A.G. Op. at 11 (citing *Stenberg v. Carhart*, 530 U.S. 914 (2000); *Women's Medical Professional Corp. v. Taft*, 353 F.3d 436 (6th Cir. 2003)).  After the issuance of the Attorney General's opinion, Michigan filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  The state argued that based on the substance of the opinion and the Attorney General's authority to bind the state's district attorneys, the statute could not be said to prohibit any constitutionally protected methods of abortion, and that the plaintiffs' case was therefore moot.

With the consent of the parties, the district court consolidated the proceedings regarding the motions for preliminary and permanent injunctive relief.  It issued an opinion on September 12, 2005 in which it denied the state's motion to dismiss, reasoning that an Attorney General's opinion "does not constitute a ruling on the constitutionality of the Act."  *Northland Family Planning Clinic, Inc. v. Cox*, 394 F. Supp. 2d 978, 985 (E.D. Mich. 2005).  It also declared the statute unconstitutional because it imposed an undue burden on a woman's right to terminate her pregnancy by prohibiting the D&E procedure, because it failed to adequately protect the health of the woman, and because it was void for vagueness due to its confusing language.  *Id*. at 985-89.  The district court's order did not provide any injunctive relief, but simply declared the Act unconstitutional.  The district court also denied a motion to intervene filed by a group called "Standing Together to Oppose Partial-Birth-Abortion" or "STTOP."  *See id*. at 989-90.  STTOP is a ballot-question committee of Right to Life of Michigan, Inc., which was formed to promote the passage of the Act.

The Attorney General and STTOP both appeal from the district court's order.

II.

A full understanding of the legal issues presented by this appeal requires some background on the abortion procedures in question.  *See Stenberg*, 530 U.S. at 922 ("[O]ur discussion might seem clinically cold or callous to some, perhaps horrifying to others.  There is no alternative way, however, to acquaint the reader with the technical distinctions among different abortions methods and related factual matters, upon which the outcome of this case depends.").

During the first trimester, abortions are typically performed by "suction curettage," where the doctor empties the uterus with suction by dilating the cervix, inserting a plastic tube into the uterus, and using suction to remove the embryo or fetus.  Another relevant abortion method that is performed during the first trimester is a "medical abortion," where the physician administers a medicine that both causes the death of the fetus and induces the uterus to contract and expel its contents.

During the second trimester, the increased size of the fetus requires more complex methods for its removal. *See Stenberg*, 530 U.S. at 925. The most common of these methods is called "dilation and evacuation," or "D&E." *Id*. D&E typically involves dilation of the cervix, followed by the extraction of part of the fetus through the cervix. The resistance caused by pulling the extracted portion of the fetus against the cervix causes the fetus to disjoin and die, after which the remaining parts are extracted. *Id*. A variation on "D&E" is known as "dilation and extraction," or "D&X," or alternatively "intact D&E."[1] The D&X procedure involves evacuating or otherwise compacting the fetus's skull while the head is still in the uterus so that the head will pass easily through the cervix. Where the fetus presents itself head first, the head is emptied and compressed first, after which the entire fetus is removed intact. If the fetus presents itself feet first, in the breech position, it is partially delivered to the point where the physician can access the fetus's head so as to puncture it and remove the contents. *See Taft*, 353 F.3d at 439-40. In some circumstances, D&X is considered by certain medical experts to be safer for the pregnant woman than D&E because it "involves less risk of uterine perforation or cervical laceration because it requires the physician to make fewer passes into the uterus with sharp instruments and reduces the presence of sharp fetal bone fragments that can injure the uterus and cervix," reduces the risk of retained fetal tissue or "free floating fetal head," and takes less time and involves less blood loss, trauma, and exposure to anesthesia. *Stenberg*, 530 U.S. at 853.

Another common second trimester procedure is induction, which appears to operate like a medical abortion occurring later in pregnancy, where a medication causes the uterus to contract and expel the fetus. Induction carries with it "all the potential complications of labor and delivery at term, and therefore, involves more pain, time and expense than D&E," as well as exposing some women to more risks of infection or other complications.[2] Joint App'x at 68, 83 (Hertz Decl., Berry Decl.). The remaining methods of second trimester abortion are hysterectomy, or removal of the uterus (which leaves the woman sterile), and hysterotomy, which is akin to a premature caesarian section. Joint App'x at 83. Both of these methods are obviously much more invasive and dangerous for the woman than D&E, D&X, or induction. *Id*.

The classifications of these particular abortion procedures are important because the Supreme Court and this Court have used them as a reference for which abortion procedures a state can permissibly prohibit under *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992). *See Gonzales*, 127 S. Ct. at 1620-23; *Stenberg*, 530 U.S. at 920; *Taft*, 353 F.3d at 439-40. *Casey* held that a state may regulate abortion before viability so long as it does not impose an "undue burden" on a woman's right to terminate her pregnancy, and may regulate and even prohibit abortion after viability "except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Casey*, 505 U.S. at 879 (citing *Roe v. Wade*, 410 U.S. 113, 164-65 (1973)).

---

[1] In its recent decision which addresses the constitutionality of the Federal Partial-Birth Abortion Ban Act of 2003, the Supreme Court primarily refers to this process as intact D&E. *See Gonzales v. Carhart*, 127 S. Ct. 1610 (2007). The Court noted that "the medical community has not reached unanimity on the appropriate name for this D&E variation," and that the procedure "has been referred to as 'intact D&E,' 'dilation and extraction' (D&X), and 'intact D&X.'" *Id*. at 1621. It does not appear that the different names incorporate any meaningful difference in the methods used. We will use the term D&X in this opinion, as it is the term utilized primarily by the parties, and, most significantly, is the nomenclature included in the Michigan Attorney General's Opinion. For purposes of this opinion, the term D&X is intended to be synonymous with the term "intact D&E" used by the Supreme Court in *Gonzales*.

[2] Classifying these various procedures involves a bit of oversimplification. As the plaintiffs' Declarant Dr. Michael Hertz indicates, physicians can never predict exactly how an abortion will proceed, and sometimes the methods must be modified during the procedure. Joint App'x at 68 (Hertz Decl.). For example, in some medical abortions and some inductions, the fetus will not pass from the uterus as smoothly as hoped, and it will become necessary to use some variation of D&E or D&X to complete the abortion. *Id*. at 66; Joint App'x at 82 (Berry Decl). Our outline focuses on the most common procedures and how they are most often used, as well as the classifications that the Supreme Court applied to them in *Stenberg* and *Gonzales*.

*Stenberg* applied this standard to a Nebraska law regarding procedures that critics labeled "partial-birth abortion." 530 U.S. at 921. The Court held that the undue burden standard simply barred a state from prohibiting "the more commonly used D&E procedure," as doing so would place "a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 938 (quoting *Casey*, 505 U.S. at 877). This portion of *Stenberg*'s holding is relatively straightforward: if a statute prohibits pre-viability D&E procedures, it is unconstitutional. *See id.*; *see also Taft*, 353 F.3d at 438. The other aspect of *Stenberg*'s holding allowed a general statutory ban on less common abortion procedures (including D&X), presumably as part of a state's ability to regulate previability abortion methods, but with a caveat: "where substantial medical authority supports the proposition that banning a particular abortion procedure could endanger women's health, *Casey* requires the statute to include a health exception when the procedure is 'necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.'" *Id.* (quoting *Casey*, 505 U.S. at 879). The *Stenberg* Court ruled that such an exception to Nebraska's ban on D&X was necessary, in light of the district court's "highly plausible record-based explanation" of why D&X "obviates health risks in certain circumstances," in light of "a division of opinion among some medical experts," and in the absence of controlled medical studies on the issue. *Stenberg*'s two-part holding, in sum, was that it is an undue burden for a state to prohibit "the more commonly used D&E procedure," and that "a statute that altogether forbids D&X creates a significant health risk," and is therefore impermissible. *Stenberg*, 530 U.S. at 938.

At the time of the district court's opinion, and during briefing and argument in this case, this precedential framework governed the limitations that Michigan could constitutionally place on abortion procedures. Since that time, however, the Supreme Court issued its decision in *Gonzales v. Carhart*, 127 S. Ct. 1610, in which it upheld as constitutional the federal Partial-Birth Abortion Ban Act of 2003, codified at 18 U.S.C. § 1531. The first relevant portion of *Stenberg*'s undue burden analysis — that a statute regulating abortion procedures cannot prohibit the D&E procedure without imposing an unconstitutional undue burden — was left undisturbed in *Gonzales*. *Id.* at 1629-31. In upholding the federal statute, however, *Gonzales* expanded on *Stenberg* in two ways. First, the Court distinguished *Stenberg* based on critical differences between the language of the Nebraska and federal statutes. Specifically, in *Stenberg*, the Nebraska statute was deemed to prohibit D&E procedures because it prohibited delivering "a substantial portion" of the fetus "for the purpose of performing a procedure" that will kill the fetus. 530 U.S. at 938-39. Because D&E often involved pulling an arm or a leg of a still living fetus past the cervix, this language would include the D&E procedure within its prohibition. *Id.* On the other hand, the federal statute provides what the Court referred to as "anatomical landmarks," which require as a prerequisite to the statutory prohibition that the fetal head or, in the case of a breech presentation, the fetal trunk past the navel must be outside the body of the woman prior to the act that causes the death of the fetus. *Gonzales*, 127 S. Ct. at 1627. Based on these "landmarks," the Court held that the federal statute could not be said to prohibit D&E, which "requires the removal of fetal parts that are ripped from the fetus as they are pulled through the cervix." *Id.* The federal statute was therefore held constitutional. By distinguishing the federal statute from the Nebraska statute, *Gonzales* did not disrupt *Stenberg*'s holding that prohibition of D&E would amount to an unconstitutional undue burden.

Second, *Gonzales* complicated the meaning of *Stenberg*'s holding regarding the need for a health and life exception. The federal Act prohibiting D&X contains no health exception, *see* 18 U.S.C. § 1531, raising a possible violation of *Stenberg*. Yet Congress justified this omission from the Act by making its own factual findings in enacting the law. In these findings, it stated that "Congress is not bound to accept the same [district court] factual findings that the Supreme Court was bound to accept in Stenberg under the 'clearly erroneous' standard," and that "overwhelming evidence presented and compiled at extensive congressional hearings . . . demonstrates that a [D&X] abortion is never necessary to preserve the health of a woman, poses significant health risks to a woman upon whom the procedure is performed and is outside the standard of medical care." Congressional Findings, ¶¶ 5, 8, Partial Birth Abortion Ban Act of 2003, Pub. L. No. 108-105, 117

Stat. 1201 (2003). Despite these congressional findings, all three district courts that addressed the federal ban in the first instance found that D&X was necessary in some circumstances to preserve the woman's health, based on medical evidence that differed from the congressional findings. *Gonzales*, 127 S. Ct. at 1635-37.[3]  Faced with these contradictory factual determinations, the Supreme Court endorsed neither in its entirety, stating that "[u]ncritical deference to Congress' factual findings in these cases is inappropriate," and, alternatively, that endorsing the findings of "part of the medical community" was "too exacting a standard to impose on the legislative power." *Id.* at 1638. In light of the factual conflict, the Court held that with respect to challenges based on the need for a health exception, facial challenges were inappropriate, but as-applied challenges could be maintained. *Id.*

We now proceed to examine how this precedential framework applies to the Michigan abortion law at issue in this case.

III.

Because the district court in this case appears to have addressed the constitutionality of the Act without crafting any injunctive relief, the issue on appeal involves only a question of law that we review de novo. *In re Koenig Sporting Goods, Inc.*, 203 F.3d 986, 988 (6th Cir. 2000).

The state focuses its appeal on three issues. First, it contends that the district court's remedy was too broad, and that instead of finding the entire statute unconstitutional, the district court should have enjoined only the unconstitutional applications of the statute and otherwise upheld it, particularly in light of the Attorney General's opinion limiting the scope of the statute. Next, Michigan argues that the district court should have found the case to be moot in light of the Attorney General's opinion, as Plaintiffs could not fear prosecution for violations of any unconstitutional applications of the statute in light of the opinion. Finally, the state claims that the district court should have certified a question regarding the scope of the statute to the Michigan Supreme Court before rendering a decision on its constitutionality. STTOP also appeals the district court's denial of its motion to intervene, both as a matter of right and its request for permissive intervention.

**A. Scope and Meaning of the Statute and the Attorney General's Opinion**

The district court found that the Act imposed an undue burden by prohibiting the D&E procedure, and failed to contain an adequate exception to protect the woman's health and life. In challenging both of these determinations, the state contends that the district court did not give adequate deference to the Attorney General's Opinion.

*1. Undue Burden Related to D&E*

Michigan does not challenge the plaintiffs' claim that it cannot prohibit the use of the D&E abortion method under *Stenberg* and *Taft*. Instead, it argues that "[a]s demonstrated by the Attorney General's Opinion, the Act must be construed to apply to only the dilation and extraction (D&X) procedure with a life and health exception consistent with *Taft* in order to give effect to the statute's legislative intent." Appellant's Br. at 11. The state neither concedes that on its face, the statute goes too far by prohibiting pre-viability abortion procedures beyond D&X, nor explicitly argues that the

---

[3] The Supreme Court stated that the three district courts "appeared to be in some disagreement on this central factual question." *Id.* at 67. Based on its description of the three district court opinions, however, the disagreement only appears to have involved the extent to which each district court credited factual assertions that differed from those made by Congress. Specifically, two district courts found that D&X was the safest procedure to preserve the woman's health in certain circumstances. *Id.* The third "was more skeptical of the purported health benefits," but nevertheless concluded that a significant body of medical opinion . . . holds that [D&X] has some safety advantages (however hypothetical and unsubstantiated by scientific evidence) over D & E for some women in some circumstances." *Id.* at *68 (quoting *Nat'l Abortion Fed'n v. Ashcroft*, 330 F. Supp. 2d  436, 479 (S.D.N.Y. 2004)).

statutory language is constitutional as written. Instead it insists that "[a] fair reading of the Michigan statute makes it clear that the [Act] contemplates prohibiting the D&X procedure alone." Appellant's Br. at 23. The gist of this argument would seem to be that the legislature intended to only prohibit D&X, even if it did so somewhat inartfully, and that the statutory language, while inexact, is subject to the narrowing construction expressed in the Attorney General's opinion. The state further argues that the district court failed to adequately consider the applicable rules of statutory construction and the Act's legislative history, and failed to adequately defer to the Michigan Attorney General's view of the law in ruling that it reached beyond the D&X procedure and was therefore unconstitutional.

Michigan largely relies on the Supreme Court's decision in *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320 (2006), in which the Court addressed a New Hampshire law that prohibited a physician from performing an abortion on a minor until 48 hours after written notice of the pending abortion was sent to the minor's parents. Although the statute in *Ayotte* provided exceptions for instances when the woman's health was at risk, the lower federal courts had determined that the provision was insufficient to adequately address such health concerns, and that the parental notification law should be enjoined entirely. *Id*. at 325-26. The Supreme Court addressed only the remedy, determining that it was too broad and that only the unconstitutional portions of the statute should have been enjoined. *Id*. at 326.

The *Ayotte* court addressed "three interrelated principles [that] inform our approach to remedies." *Id*. at 329. First, the Court seeks to avoid "nullify[ing] more of a legislature's work than is necessary," because doing so "frustrates the intent of the elected representatives of the people." *Id*. For this reason where partial, rather than facial, invalidation is possible, it is the "required course." *Id*. Second, the Court noted that "mindful that our constitutional mandate and institutional competence are limited, we restrain ourselves from rewriting state law to conform it to constitutional requirements even as we strive to salvage it." *Id*. This consideration counsels in favor of looking to how clearly the court has "already articulated the background constitutional rules at issue and how easily we can articulate the remedy." *Id*. Thus where the Court has established a bright line constitutional rule, it is more appropriate to invalidate parts of the statute that go beyond the constitutional line, whereas "making distinctions in a murky constitutional context, or where line-drawing is inherently complex, may call for a 'far more serious invasion of the legislative domain' than we ought to undertake." *Id*. at 330 (quoting *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 479 n.26 (1995)). Finally, the Court considers legislative intent, and inquires whether the legislature would prefer to have part of the statute remain in force. *Id*. At the same time, however, the Court is "wary of legislatures who would rely on our intervention," because where states merely cast as wide a net as possible and leave it to the courts to determine the permissible extent of a statute's reach, they run the risk of delegating legislative authority to the judiciary. *Id*. In light of these three considerations, the *Ayotte* Court remanded the case, ordering that "[e]ither an injunction prohibiting unconstitutional applications or a holding that consistency with legislative intent requires invalidating the statute *in toto*" was the proper result. *Id*. at 331.

At first blush, there could appear to be some degree of tension between the Supreme Court's command in *Ayotte* that lower federal courts consider partial invalidation of a law's unconstitutional portions before enjoining it in its entirety, and its prior decision in *Stenberg*, in which it upheld the complete invalidation of Nebraska's statute relating to D&E procedures. The Nebraska statute addressed in *Stenberg* generally prohibited what it termed "partial-birth abortion" (with certain health-related exceptions), which it defined as "an abortion procedure in which the person performing the abortion partially delivers vaginally a living unborn child before killing the unborn child and completing the delivery." 530 U.S. at 922. The statutory definition of "partial delivery" included delivery "into the vagina a living unborn child, or a substantial portion thereof." *Id*. Much like the Michigan Attorney General argues here, the Nebraska Attorney General sought to have the Court uphold the statute based on his narrowing construction, contending that the statutory language of the Nebraska statute differentiated between D&E and D&X. The Court determined that it had

to "reject his interpretation, for it conflicts with the statutory language," reasoning that "we are 'without the power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent.'" 530 U.S. at 942, 944 (quoting *Boos v. Barry*, 485 U.S. 312, 330 (1988)). As the Court noted, "D&E will often involve a physician pulling a 'substantial portion' of a still living fetus, say an arm or leg, into the vagina prior to the death of the fetus." *Id*. at 939. Thus, the Attorney General's claim that the statute only applied to D&X procedures was simply at odds with the plain language of the statute.

A closer reading of *Ayotte* and *Stenberg* reveals that their remedial approaches are not inconsistent with each other, despite differences between the remedy eventually imposed in each case. First, a substantive distinction between the statutes addressed in the two cases rendered partial invalidation a more natural approach in *Ayotte* than in *Stenberg*. The *Ayotte* Court concluded that in general, New Hampshire's parental notification requirement was constitutional. 546 U.S. at 326. Under the Court's precedent, however, it was undisputed that the law had to have an exception that would allow abortions without consent from a parent or a judge where they were necessary to protect the life and health of the woman, and the Court found New Hampshire's health exception insufficient. *Id*. at 327-28. Because the unconstitutional portion of the statute (the emergency health exception) was a provision that could be addressed separately from the underlying rule (the parental consent requirement), it was a strong candidate for partial invalidation. In contrast, the underlying rule in *Stenberg* simply functioned to prohibit D&E procedures. In order to modify this rule to undo the undue burden, a full-blown rewriting of state law would have been required, a course that *Ayotte* itself cautions against.

The *Ayotte* Court also distinguished *Stenberg*'s remedy by noting that "the parties in *Stenberg* did not ask for, and we did not contemplate, relief more finely drawn." *Id*. at 331. Interestingly, however, although the parties in *Stenberg* did not seek severance or partial invalidation, the Nebraska Attorney General did seek to have the Court adopt his narrowing interpretation. The Court expressly declined this request, noting that "we are aware that adopting the Attorney General's interpretation might avoid the constitutional problem discussed in this section. But we are 'without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent.'" 530 U.S. at 944 (quoting *Boos*, 485 U.S. at 330). These statements in the two cases indicate that there is a meaningful distinction between partially invalidating or severing a statute (the course preferred under *Ayotte*), and adopting a narrowing construction (the course rejected in *Stenberg* and requested here by the Michigan Attorney General). It may well be that a strained narrowing construction has more potential to amount to judicial rewriting of the statute than does partial invalidation, even though the two appear to be closely related. Although Michigan conflates the two doctrines, we nevertheless agree that if either of these more limited remedies is available, they would be the preferred course.

The bottom line is that the limited remedy under either constitutional avoidance or partial invalidation must be consistent with the text of the statute, lest the courts usurp the legislative function. *See Ayotte,* 546 U.S. at 330 ("[I]t would certainly be dangerous if the legislature could set a net large enough to catch all the possible offenders, and leave it to the courts to step inside to announce to whom the statute may be applied." (quoting *United States v. Reese*, 92 U.S. 214, 221 (1876)). This point was recently reinforced in *Gonzales*, where the Court deemed applicable the doctrine of constitutional avoidance without disturbing the doctrine's inapplicability with respect to the Nebraska statute addressed in *Stenberg*. 127 S. Ct. at 1631. The Court specifically "put . . . to rest" what it described as the "antagonistic 'cannon of construction under which in cases involving abortion, a permissible reading of a statute [was] to be avoided at all costs.'" *Id*. (quoting *Stenberg*, 530 U.S. at 977 (Kennedy, J. dissenting)). Even so, it affirmed *Stenberg*'s "uncontroversial proposition that the canon of constitutional avoidance does not apply if a statute is not 'genuinely susceptible to two constructions.'" *Id*. (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 238 (1998)).

With this background and the preference for a limited remedy in mind, it is apparent that *Stenberg* largely governs our analysis here, given the striking similarities it shares with this case. Much like the Nebraska statute, the Michigan statute applies as soon as a portion of the fetus passes beyond the vaginal introitus.[4] As the Supreme Court in *Stenberg* and the district court here both recognized, this necessarily means it applies to D&E procedures. Further, Plaintiffs submitted unrebutted evidence from their declarants that the statute could also apply to the protected suction curretage procedure. Because suction curretage is used more often than D&E, and used earlier in the pregnancy at a time more removed from viability, the potential for a statutory prohibition of some suction curretage procedures would impose even more of an undue burden on a woman's right to terminate her pregnancy than a prohibition of D&E. In fact, the one procedure the statute would appear not to apply to is a D&X procedure where the fetus presents itself headfirst, as that is the one instance where its death is brought about (through evacuation of the skull) before any portion of it passes beyond the cervix or vaginal introitus. Thus, just as in *Stenberg*, the Michigan Attorney General's interpretation of the statute to only apply to D&X procedures and not D&E procedures is entirely at odds with the language of the statute. The statute is "not genuinely susceptible to two constructions," and therefore the canon of constitutional avoidance does little to save it. *See Gonzales*, 127 S. Ct. at 1631. Were we to place our judicial imprimatur on the Attorney General's opinion, we would impermissibly usurp the function of the Michigan legislature.

The reasoning set forth in the Michigan Attorney General's opinion actually reinforces our determination that its narrowing construction is at odds with the language of the statute. The opinion states that "the D&E procedure requires dismemberment or disarticulation of the fetus and removal of the dead fetus 'piece-by-piece' from the woman's uterus — there is no intact extraction of the fetus," and concludes that as a result "the fetus would never achieve the status of a perinate under the statute." A.G. Op. at 9. This conclusion is based on either a misunderstanding or an inaccurate description of the D&E procedure. *Stenberg* and *Taft* — and the evidence before the district court in this case — make clear that D&E involves and even requires removing a portion of the fetus from the uterus before dismemberment. *See Stenberg*, 530 U.S. at 939; Joint App'x at 67 (Hertz Decl.). Under this procedure, the fetus would therefore become a perinate, as part of it will pass the vaginal introitus, and its subsequent demise would subject the physician to criminal liability based on the Michigan statute. As the Court stated in *Stenberg*, "[t]he relevant question is *not* whether the legislature wanted to ban D&X; it is whether the law was intended to apply *only* to D&X. The plain language covers both procedures." 530 U.S. at 939 (emphasis in original). The same reasoning applies here.

The Supreme Court's holding in *Gonzales* is also of little avail to Michigan on this point. *Gonzales* left undisturbed the holding from *Stenberg* that a prohibition on D&E amounts to an undue burden on a woman's right to terminate her pregnancy. 127 S. Ct. at 1626-27. Although the Court upheld the federal ban, it explicitly distinguished it from the Nebraska ban addressed in *Stenberg*. Most significantly for present purposes, the "anatomical landmarks" in the federal ban ensured that it did not prohibit standard D&E. The Nebraska statute's reference to a "substantial portion" of the fetus did not lend itself to a similar limitation. When compared to these other two statutes, the Michigan statute, which applies when "any anatomical part" of the fetus passes the vaginal introitus, is easily the most sweeping and the most burdensome of the three. That is, whatever "substantial part" means, it must require the removal of more than "any anatomical part," and both clearly fall

---

[4] There is a slight distinction in that the Nebraska statute applied where a portion of the fetus passed beyond the cervix into the vagina, as opposed to the vaginal introitus. The evidence before the district court indicated that this is not a meaningful distinction, and Michigan does not argue to the contrary. In his declaration, Dr. Michael Hertz explained that in a D&E procedure "[i]t is not unusual that I will pull a fetal part past the vaginal introitus before it is disarticulated from the rest of the fetus. This is particularly so because during a D&E, I use a tenaculum to pull the cervix towards the vaginal introitus, which shortens, if not eliminates, the distance between the cervix and vaginal introitus, . . . [which is] crucial — both in D&E and suction curettage procedures — to avoid injury due to instrumentation in the uterus." Joint App'x at 67 (Hertz Decl. at 5).

short of the "anatomical landmarks" of the federal ban.  Because an anatomical part must be removed to conduct a D&E abortion, it is apparent that the Michigan statute would prohibit D&E, and under the framework of *Stenberg* and *Gonzales*, impose an unconstitutional undue burden.

Additionally, as the plaintiffs point out and the district court found, the statute's plain language would also apply to some suction curretage abortions, medical abortions and induction abortions, because the signs of life identified in the statute, such as a heartbeat, are often present after the fetus or embryo passes beyond the vaginal introitus in such procedures.  384 F. Supp. 2d at 985-86.  This fact further supports the conclusion that the statute is unconstitutional, particularly because it would prohibit several of the most common pre-viability abortion methods.  As *Stenberg* instructs us, this effect creates an unconstitutional undue burden in violation of *Casey*.  The Act's failure to distinguish between pre- and post-viability abortions only exacerbates this problem.  *See Stenberg*, 530 U.S. at 930 ("The fact that Nebraska's law applies both pre- and post-viability aggravates the constitutional problem presented.").

Our decision is also well supported by the Supreme Court's warning to be wary of statutes that set an extremely wide net of prohibited conduct, and leave it to the courts to set the constitutional boundaries.  The rationale behind this rule is that such an approach would involve "substitut[ing] the judicial for the legislative department of the government."  *Ayotte*, 546 U.S. at 330.  This warning is apropos here — the Michigan legislature appears to have cast a wide net that would prohibit virtually all methods of abortions once a fetal heart beat is detectable, including the constitutionally protected D&E procedure, despite knowing that some of these procedures were constitutionally protected, and perhaps with the intention of prohibiting everything the federal courts will allow.  A court order prohibiting the statute from applying beyond the D&X procedure would involve the Court too deeply in the legislative process, as warned against in *Ayotte*.  The language the legislature settled upon would in fact allow some D&X procedures while prohibiting most constitutionally protected procedures — an approach that undermines our ability to narrow or partially invalidate the statute to render it constitutional under both *Stenberg* and *Ayotte*.  Ultimately, because any limitation would be entirely at odds with the language of the statute, such an approach would contravene the holding of *Stenberg*.

In support of its position, Michigan also points to this Court's decision in *Taft*, which upheld an Ohio statute prohibiting partial birth abortion.  A reading of the statute at issue in *Taft* presents a clear distinction from the Michigan statute.  The statute in *Taft* explicitly stated that "[t]his section does not prohibit the suction curretage procedure of abortion, the suction aspiration procedure of abortion, or the *dilation and evacuation procedure of abortion*."  353 F.3d at 452 (citing Ohio Rev. Code Ann. § 2919.15.1(f)) (emphasis in *Taft*).  Although the statute did not itself define "dilation and evacuation," this Court was not troubled by the omission, as it concluded that the meaning of the term was commonly known.  *See id.* at 452-53.  The Michigan statute contains no similar exception or clear definitions that would avoid sweeping up protected abortion procedures within its prohibition, and thus *Taft* is of no help to the state here.

The state also points to the legislative history of the Act to support its claim that it was intended to prohibit only D&X, and not D&E.  This argument is flawed at the outset, however, given the unambiguous language of the statute, which applies any time a portion of the fetus passes the vaginal introitus, rendering it unnecessary to rely upon the legislative history here.  *See Sherwin-Williams Co. v. United States*, 403 F.3d 793, 797 (6th Cir. 2005) ("Because the relevant Code provisions are unambiguous, . . . there is no need to consult legislative history.").  Additionally, the substance of the legislative history is actually more ambiguous than the statutory language.  In the statements cited by Michigan, most of the state legislators refer to "partial-birth abortion" without distinguishing between D&X and D&E.  See Appellant's Br. at 25-26.  In fact, the term could be read to apply to either method, as D&E involves the partial delivery of a portion of the fetus which

the physician subsequently pulls on to bring about dismemberment.[5]   Although some of the legislators' comments reference the collapse of the fetus's head, which is used in D&X, others use language that refers to both procedures. *Id*. at 25 (characterizing the bill as "granting protection as soon as a single part of the baby's anatomy clears the vaginal opening"). The legislative history is of no help to the state, primarily because the text of the statute is unambiguous, but also because the legislative history only creates potential ambiguity. The Supreme Court rejected the legislative history as a source of guidance in *Stenberg* for similar reasons. 530 U.S. at 943.

The state finally contends that the Attorney General's Opinion should have been granted a greater degree of deference by the district court as a persuasive authority for interpreting Michigan law. This argument is similarly belied by *Stenberg*. The Court noted that "[t]his Court's case law makes clear that we are not to give the Attorney General's interpretative views controlling weight," adding that "our precedent warns against accepting as 'authoritative' an Attorney General's interpretation of state law when 'the Attorney General does not bind the state courts or local law enforcement agencies.'" 530 U.S. at 940. The parties agree that the Michigan Attorney General cannot bind the state's courts. Although the Attorney General argues that he can bind local prosecutors, this would not appear to be sufficient under *Stenberg*, particularly because, as the plaintiffs point out, an Attorney General's Opinion has no precedential value, and can be revised any time by this or successive Attorneys General. Moreover, as the *Stenberg* Court noted, "even were we to grant the Attorney General's views 'substantial weight,' we still have to reject his interpretation, for it conflicts with the statutory language." 530 U.S. at 942. For the reasons already discussed, the Michigan Attorney General's Opinion also conflicts irreconcilably with the statutory language. Therefore, the district court correctly rejected deferring to the Attorney General's opinion here.

Although federal courts are required to seek to uphold the constitutionality of state statutes where possible so as to refrain from interfering with the democratic functioning of a state's representative government, in this case Michigan passed a statute that clearly went beyond the limitations established by the Supreme Court in *Stenberg* on a nearly identical issue. Further, the statute was passed after this Court's decision in *Taft*, which upheld a significantly narrower Ohio statute in a decision that outlined at length the limitations on a state's ability to regulate abortion procedures under *Stenberg*. *See* 353 F.3d at 443-53. Michigan therefore had significant guidance in implementing a statute that would ban only the D&X procedure — the goal that the state now contends it was attempting to achieve — but instead passed a very broadly-worded statute that showed no meaningful attempt to comply with the constitutional limitations articulated by federal courts in the area of abortion law. We are not in a position to rectify this dragnet approach to legislation, and must affirm the district court's invalidation of the statute based on the undue burden imposed by its general prohibition of many constitutionally protected abortion procedures.

The district court's decision that Michigan's broad abortion statute created an unconstitutional undue burden on a woman's right to terminate her pregnancy because it prohibits D&E was in full accordance with the Supreme Court's guidance in both *Stenberg* and *Ayotte*, and has in no way been undermined by the interim decision in *Gonzales*. It is therefore affirmed.

---

[5] In *Gonzales*, the Court read the term "partial-birth abortion" to refer only to D&X, but this interpretation was based on the definition provided in the federal statute. 127 S. Ct. at 1624. In contrast, the Nebraska statute addressed in *Stenberg* provided the more sweeping definition of "partial-birth abortion" that included D&E, leading to a broader interpretation of it in that case. *See* 530 U.S. at 922. The term apparently has no established medical definition. *See Gonzales*, 127 S. Ct. at 1641 n.1 (Ginsburg, J., dissenting) ("The term 'partial-birth abortion' is neither recognized in the medical literature nor used by physicians who perform second-trimester abortions."). Without some contextual backdrop, comments by legislators that only reference "partial-birth abortion" cannot be more narrowly read to apply only to D&X.

## 2. *Life and Health Exception*

The life and health exceptions in the Michigan statute provide as follows:

(2) A physician or an individual performing an act, task, or function under the delegatory authority of a physician is immune from criminal, civil, or administrative liability for performing any procedure that results in injury or death of a perinate while completing the delivery of the perinate under any of the following circumstances:
(a) If the perinate is being expelled from the mother's body as a result of a spontaneous abortion.
(b) If in that physician's reasonable medical judgment and in compliance with the applicable standard of practice and care, the procedure was necessary in either of the following circumstances:
(i) To save the life of the mother and every reasonable effort was made to preserve the life of both the mother and the perinate.
(ii) To avert an imminent threat to the physical health of the mother, and any harm to the perinate was incidental to treating the mother and not a known or intended result of the procedure performed.

Mich. Comp. Laws § 333.1083. The district court found the health exception in part (2)(b)(ii) of the statute inadequate because in every abortion, the physician knows the outcome of the procedure to be the demise of the perinate. 384 F. Supp. 2d at 987. Thus, the district court concluded that the exception is essentially inoperative on its own terms, as it would prohibit every D&E and D&X procedure used to protect the health of the woman, in contravention of the holding in *Stenberg*. Similarly, with regard to the life exception in part (2)(b)(i), the provision that every reasonable effort must be made to save the life of the perinate requires the physician to balance the life of the woman with that of the perinate. The Supreme Court has found life exceptions to be inadequate where they "require the mother to bear an increased medical risk in order to save her viable fetus." *Thornburgh v. American College of Obstetricians & Gynecologists*, 476 U.S. 747, 769 (1986). Because the life exception here does just that, the district court also found it to be unconstitutional. 384 F. Supp. 2d at 987-88.

As discussed above in Part II of this opinion, the Supreme Court's holding in *Stenberg* pertaining to the need for a health exception to otherwise valid D&X prohibitions was modified somewhat in *Gonzales*. It is not immediately apparent how this decision should affect Michigan's statute. On the one hand, *Gonzales*'s holding that an exception allowing D&X might not always be medically necessary was premised on a conflicted factual record, and doubts about the medical need for such an exception would appear to apply with equal force in this case. On the other hand, the factual findings that cast doubt on the safety implications of D&X were not part of the record in this case, were not a basis for the passage of the Michigan statute, and were made by the legislative body of an entirely separate sovereign, suggesting the possibility that they could be of diminished relevance here.

The most straightforward implication of *Gonzales* in this context might be its statement that facial challenges are not the preferred mechanism for challenges pertaining to health exceptions to prohibitions on the D&X procedure, suggesting that such a challenge should not be entertained here. Even so, it is not apparent how and whether *Gonzales* diminishes the rule requiring an exception to protect the woman's life that does not impose upon her an increased medical risk. *See Thornburgh*, 476 U.S. at 769 (prohibiting a "'trade-off' between the woman's health and additional percentage points of fetal survival.'" (citing *Colautti v. Franklin*, 439 U.S. 379, 397-401 (1979)). The federal statute contains an apparently adequate life exception that allows D&X where necessary to save the life of the woman, which went unchallenged in *Gonzales*. *See* 18 U.S.C. § 1531(a) ("This subsection does not apply to a partial-birth abortion that is necessary to save the life of a mother .

. .").  This suggests that the Supreme Court's precedent pertaining to the life exception remains unchanged.

For purposes of resolving the instant case, we can affirm the district court's decision without addressing the complicated implications of *Gonzales* for the life and health exceptions of the Michigan statute.  The bottom line is that the life and health exceptions are *exceptions* to an unconstitutional and un-fixable general prohibition on certain abortion procedures.  That is to say it is unnecessary for us to address exceptions to an unconstitutional and unenforceable general rule.  Because we find the general prohibition to be unconstitutional, and we are unable and unsuited to rewriting a prohibition on the D&X procedure alone, there is little to gain by an attempt to resolve this issue.

### 3.  Void for Vagueness

The district court further concluded that the Act was void for vagueness due to its confusing and ambiguous nature.  The district court specifically noted that the Act "does not specify what medical procedures are banned and does not set forth specific penalties for violation of its terms." 394 F. Supp. 2d at 989.  It also found that "the term 'perinate' is not a commonly used definition within the medical community," and further based its vagueness determination on the failure to define the terms "imminent threat" and "every reasonable effort." *Id.*

A statute is void for vagueness where it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute, or is so indefinite that it encourages arbitrary and erratic arrests and convictions." *Colautti v. Franklin*, 439 U.S. 379, 390 (1979).  Due process provides heightened protection against vague statutes "where the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights." *Id.*

We believe that the void for vagueness challenge presents a closer question than the undue burden challenges under *Stenberg* discussed above.  It would in some ways seem that Plaintiffs' argument that the statutory language is clearly unconstitutional and that the Attorney General's Opinion cannot be read as a reasonable interpretation cuts against their void for vagueness argument. It does appear that some of the terms in the health and life exceptions are poorly defined, and would fail to notify physicians of exactly when these exceptions would apply, although these shortcomings do not bear upon the separate question of whether the general, prohibited conduct is vague, aside from the exceptions.  At any rate, in light of our decision to affirm the district court's decision under *Stenberg*, we decline to reach the separate void for vagueness claim.

### B.  Mootness

Michigan argues that the plaintiffs' claims became moot after the issuance of the Attorney General's opinion, which interpreted the statute as not applying to constitutionally protected abortion procedures.  The state contends that based on the opinion, the plaintiffs no longer have a fear of prosecution for performing constitutionally protected abortions.

We reject the state's mootness argument for several reasons.  First, the opinion does not even provide an accurate description of the constitutionally protected D&E procedure, and thus cannot be said to allay fears of prosecution for performing constitutionally protected abortions. The opinion describes D&E as requiring dismemberment within the fetus prior to removal of any of the parts, which would prevent the fetus from ever becoming a perinate.  A.G. Op. at 9.  This reading is entirely at odds with the evidence before the district court as well as the description of D&E given in *Stenberg*.  Significantly, the *Stenberg* Court based its holding in part on the evidence that "D&E will often involve a physician pulling a 'substantial portion' of a still living fetus, say, an arm or leg, into the vagina prior to the death of the fetus."  530 U.S. at 939.  Additionally, Hertz explained in his declaration here that "[i]t is not unusual that I will pull a fetal part past the vaginal introitus before it is disarticulated from the rest of the fetus," due to the narrowing of the distance between

the cervix and the vaginal introitus that occurs during the procedure. Joint App'x at 67 (Hertz Decl. at 5). This process clearly involves the fetus becoming a perinate, and the physician would be subject to prosecution for conducting the subsequent abortion. Because even the Attorney General's opinion incorrectly describes the D&E procedure, it would not allay any fear of prosecution that a physician might have when he performs a constitutionally protected D&E abortion where part of the perinate passes the vaginal introitus, because that procedure would not be covered by the opinion. This ambiguity renders the opinion itself vague (wholly independent from the question of whether the statute is vague), as it "conditions potential criminal liability on confusing and ambiguous criteria." *Colautti*, 439 U.S. at 394. As a result, it "presents serious problems of notice, discriminatory application, and chilling effect on the exercise of constitutional rights." *Id*.

Further, as the plaintiffs point out, the opinion cannot alleviate fear of prosecution because it is not precedential, and the current Attorney General could change it whenever he sees fit, as could any future Attorneys General. The state has also conceded that the Attorney General's opinion is not binding on Michigan courts. Further, the extent to which it binds local prosecutors is at most unclear. On the one hand, the Michigan Supreme Court has stated that "the opinion of the Attorney General that a statute is unconstitutional does not have the force of law and certainly does not compel agreement by a governmental agency." *School Dist. v. Kent County Tax Allocation Bd.*, 330 N.W.2d 7, 12 (Mich. 1982). On the other hand, a Michigan statute provides that "[t]he Attorney General shall supervise the work of, consult and advise the prosecuting attorneys, in all matters pertaining to the duties of their offices." Mich. Comp. Laws § 14.30. Even if we were to assume that the Attorney General can prevent local prosecutors from enforcing the statute, this is somewhat beside the point, because given the non-binding nature of the opinion on the office of the Attorney General itself, it is insufficient to prevent Plaintiffs from having a fear of future prosecution.[6]

Even though "cessation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties," a party still bears a heavy burden to show that a case is mooted. *Ammex, Inc. v. Cox*, 351 F.3d 697, 705 (6th Cir. 2003);[7] *see also Akers v. McGinnis*, 352 F.3d 1030, 1035 (6th Cir. 2003) ("The 'heavy burden of persuading' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness."). In this case, that burden is increased by the fact that the voluntary cessation only appears to have occurred in response to the present litigation, which shows a greater likelihood that it could be resumed. *See Ragsdale v. Turnock*, 841 F.2d 1358, 1366 (7th

---

[6] The state also argues that were any physicians to be prosecuted for performing abortions despite the Attorney General's Opinion, they could claim a defense of entrapment by estoppel, which provides an affirmative defense where a government official has assured a defendant that certain conduct is legal before the defendant engages in the conduct. As the plaintiffs point out, because entrapment by estoppel is an affirmative defense, it would not prevent them from being prosecuted, but at best would present a barrier to a conviction. This is cold comfort, and the prospect of being prosecuted and forced to litigate an affirmative defense could well impose a significant chilling effect on its own. Moreover, because the Attorney General's Opinion does not accurately define the constitutionally protected D&E procedure, it would not prevent a conviction in a case where a physician performed a D&E that was protected under *Stenberg* but did not fall within the definition offered by the Attorney General. Such a conviction would violate *Stenberg*, and thus the defense of entrapment by estoppel does little to advance the state's mootness argument.

[7] In *Ammex Inc. v. Cox,* we rejected a mootness claim based on a Michigan Attorney General's statement that he will not seek to prosecute legally protected activity, stating that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. . . . If it did, the courts would be compelled to leave the defendant . . . free to return to his old ways." 351 F.3d at 704. In *Ammex*, the Attorney General had issued a Notice of Intended Action, indicating that he would seek to prevent alleged false advertising by a duty-free store regarding the application of state taxes. We reversed the district court's decision that the Attorney General's later withdrawal of the Notice made the case moot because "the Attorney General's withdrawal did not make it absolutely clear that the allegedly wrongful conduct could not be reasonably expected to recur." *Id.* at 704. This rationale applies here with equal force. It is not apparent to us how the Notice of Intended Action is different in any way under state law than an Attorney General's opinion, and the state has not argued that it is.

Cir. 1988) ("We share the district court's concern that the State's position on this provision is asserted only in this litigation."). Although the Attorney General has shown some willingness here to limit the scope of the Act, because he only did so once this lawsuit was filed, and even then did not correctly assess or define the constitutionally protected abortion methods, the state has not met the "heavy burden" of showing that it will not prosecute constitutionally protected abortions under the Act, and we therefore reject the state's mootness argument.

### C.  Certification to the Michigan Supreme Court

The state's claim that the question of the Act's meaning should be certified to the Michigan Supreme Court is simply contravened by express language in *Stenberg*, a nearly indistinguishable case.  There, although the Nebraska Attorney General had not sought certification to the state supreme court in the lower federal courts, the Court stated that certification would still not have been appropriate, as "[c]ertification of a question (or abstention) is appropriate only where the statute is 'fairly susceptible' to a narrowing construction."  530 U.S. at 945.

A prerequisite to certification to a state supreme court is a determination that the statute in question is subject to a narrowing interpretation.  *See Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997) (stating that before a federal court certifies a question to a state supreme court, it must "'first ascertain whether a construction . . . is fairly possible' that will contain the statute within constitutional bounds." (quoting *Ashwander v. TVA*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring)).  Because we agree with the district court that the language of the statute here is not subject to a limiting construction, this prerequisite for certification is not met.  *See also Stenberg* 530 U.S. at 945 ("[W]e have never held that a federal litigant must wait a state-court construction or the development of an established practice before bringing the federal suit.").  We therefore reject the state's argument that the district court should have certified the question to the Michigan Supreme Court before rendering its decision.

### IV.

### A.  STTOP's Motion for Intervention as of Right

We turn now to STTOP's appeal of the denial of its motion for intervention.  Rule 24 provides in pertinent part that

> [u]pon timely application anyone shall be permitted to intervene in an action . . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed. R. Civ. P. 24(a).  A proposed intervenor must establish four elements to be entitled to intervene as of right: (1) that the motion to intervene was timely; (2) that the intervenor has a substantial legal interest in the subject matter of the case; (3) that its ability to protect that interest may be impaired in the absence of intervention; and (4) that the parties already before the court may not adequately represent its interest.  *Grutter v. Bollinger*, 188 F.3d 394, 397-98 (6th Cir. 1999).  The district court found that STTOP did not have an adequate legal interest to intervene given its status as a mere supporter of a single piece of legislation, and that the Attorney General would fully protect its interests.  This Court reviews de novo motions to intervene as of right, except for the timeliness element, which is reviewed for abuse of discretion.  *Id.*  Because the timeliness element is not in dispute here, we review the entire intervention of right issue de novo.

We note at the outset that the significance of STTOP's appeal of the denial of its motion for intervention is somewhat unclear in light of our decision to affirm the summary judgment entered

by the district court on the merits.  The finality of the summary judgment decision clearly has potential to render moot STTOP's motion to intervene.  On the other hand, in light of STTOP's argument that it would have argued the case and developed the factual record differently than the state, a remand might be necessary to provide STTOP such an opportunity if the motion to intervene was incorrectly denied.  In light of this possibility, we will address STTOP's appeal of the denial of its motion for intervention.

STTOP argues that as a public interest group involved in the process leading to the adoption of the challenged statute, it has a legal interest in the subject matter of the lawsuit.  It cites to several cases from the Ninth Circuit applying such a rule.  Plaintiffs distinguish the cases cited by STTOP by arguing that all of them involved long-standing groups with a broader interest than a single piece of legislation, as opposed to STTOP, which was created and continues to exist only for the purposes of advocating the passage and continued viability of the Act.  *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397-98 (9th Cir. 1995) (allowing conservation group to intervene in suit related to protected status of snail species); *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 526-28 (9th Cir. 1983) (allowing Audobon Society to intervene as of right in suit challenging a birds of prey conservation area); *State of Idaho v. Freeman*, 625 F.2d 886 (9th Cir. 1980) (allowing National Organization for Women to intervene in suit challenging ratification procedures for Equal Rights Amendment).

We have cited favorably to the Ninth Circuit cases relied on by STTOP in *Michigan State AFL-CIO v. Miller*, for the propositions that "a public interest group that is involved in the process leading to adoption of legislation has a cognizable interest in defending that legislation," and that "rules governing intervention are 'construed broadly in favor of the applicants.'"  103 F.3d 1240, 1245 (6th Cir. 1997).  In *Miller*, we allowed the Michigan Chamber of Commerce to intervene as of right in a suit challenging amendments to the state's campaign finance law whose enactment the chamber had supported.  We noted that the Chamber's legal interest was supported by four significant factors:

> (1) a vital participant in the political process that resulted in legislative adoption of the 1994 amendments in the first place, (2) a repeat player in Campaign Finance Act litigation, (3) a significant party which is adverse to the challenging union in the political process surrounding Michigan state government's regulation of practical campaign financing, and (4) an entity also regulated by at least three of the four statutory provisions challenged by plaintiffs.

*Id.* at 1247.  In finding that the Chamber had a legal interest, we noted that "the intervention issue raised in this appeal is a close one."  *Id.*  Here, STTOP might share two of these four factors with the Chamber of Commerce, but clearly does not share the other two.  Although STTOP was involved in the process that resulted in the passage of the challenged legislation, and might be adverse to the plaintiffs in the state's regulation of abortion practices, it is not a repeat player in litigation, as it was created for only one specific ballot initiative, and is not itself regulated by any of the statutory provisions at issue here.  This fourth factor is particularly significant — unlike the Chamber of Commerce in *Miller*, STTOP has only an ideological interest in the litigation, and the lawsuit does not involve the regulation of STTOP's conduct in any respect.  Thus, STOPP's case for intervention here is much weaker than that of the Chamber of Commerce in *Miller*.

The plaintiffs rely largely on our opinion in *Providence Baptist Church v. Hillandale Comm., Ltd.*, which affirmed the denial of a motion to intervene as of right by a committee that existed to support a local referendum to amend a zoning ordinance.  425 F.3d 309, 316 (6th Cir. 2005).  Because the committee's interest lay only in passing the referendum, the Court reasoned that "[a]ny substantial legal interest held by 'the duly authorized committee for a referendum which circulated the referendum petitions' was terminated when the referendum was held and the results certified."  *Id.* at 317.  Similarly, where STTOP was created and continues to exist for the purpose of passing

and upholding the Act, its legal interest can be said to be limited to the passage of the Act rather than the state's subsequent implementation and enforcement of it.

The rationale behind denying intervention in *Providence Baptist* also points to a useful distinction from the Ninth Circuit cases cited in *Miller* and relied upon here by STTOP — those cases all involved challenges by a public interest group to the *procedure* required to pass a particular rule, as opposed to the government's subsequent enforcement of the rule after its enactment. *See id.* ("In contrast to the cases cited by Hillandale Committee in its brief, this case raises no issue as to the validity of the election."); *see also Idaho Farm Bureau*, 58 F.3d at 1397 (involving an underlying suit challenging the process by which a rule was adopted by the Secretary of the Interior); *Sagebrush Rebellion*, 713 F.2d at 526 (same); *Freeman*, 625 F.2d at 886 (underlying suit involved state procedure for ratification of constitutional amendment). We find this distinction to be compelling, as the public at large — including public interest groups — has an interest in the procedure by which a given legal requirement is enacted as a matter of democratic legislative process. On the other hand, in a challenge to the constitutionality of an already-enacted statute, as opposed to the process by which it is enacted, the public interest in its enforceability is entrusted for the most part to the government, and the public's legal interest in the legislative process becomes less relevant.

To be sure, public interest groups who are regulated by the new law, or, similarly, whose members are affected by the law, may likely have an ongoing legal interest in its enforcement after it is enacted. *See Grutter*, 188 F.3d at 401 (finding that proposed intervenors, who were applicants to University of Michigan, had a substantial legal interest in the school's admissions process). If the statute in this case regulated STTOP or its members, STTOP would likely have a legal interest, much like the intervenors in *Grutter* who were applicants to the University of Michigan. Alternatively, had STTOP sought to intervene in a suit challenging the legislative process by which the statute was enacted, its legal interest would be significantly stronger due to its involvement in the passage of the Act. After the Act's passage, however, STTOP's interest in the enforcement of the statute is greatly diminished due to the state's responsibilities in enforcing and defending it as it is written. As things now stand, STTOP's interest in this case simply pertains to the enforceability of the statute in general, which we do not believe to be cognizable as a substantial legal interest sufficient to require intervention as of right.

Without these sorts of limitations on the legal interest required for intervention, Rule 24 would be abused as a mechanism for the over-politicization of the judicial process. Because STTOP lacks a substantial legal interest in the outcome of the case, we affirm the district court's denial of its motion to intervene as of right, and need not address the other elements of intervention.

### B. Permissive Intervention

Rule 24(b) provides that

> [u]pon timely application anyone may be permitted to intervene in an action: . . . (2) when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

"The denial of permissive intervention should be reversed only for clear abuse of discretion by the trial judge." *Purnell v. Akron*, 925 F.2d 941, 951 (6th Cir. 1991). Here, the district court explained that it would not allow permissive intervention, reasoning that STTOP and Right to Life of Michigan were "openly hostile to Plaintiffs," and that based on their ideological goals, STTOP's "presence would seriously delay the adjudication and resolution of the matter since other issues would be raised by STTOP." 384 F. Supp. 2d at 990. This conclusion appears to be supported by the record, and is evinced by STTOP's brief here, which takes an ideological approach to the litigation rather

than attempting to argue for the Act's validity under the relevant Supreme Court precedent. The district court also allowed STTOP to file an amicus brief along with two other separate entities. The district court appears to have addressed the relevant criteria required by Rule 24(b), and its denial of permissive intervention cannot be said to have been an abuse of discretion.

V.

We certainly are reluctant to interfere with a statute that represents the will of the elected representatives of the people of Michigan, and do not do so lightly. If, however, the Michigan legislature had sought in good faith to enact a statute that prohibited the abortion procedures it deemed objectionable while complying with the limits imposed by the Constitution, it had plenty of guidance on how to proceed. The Supreme Court's decision in *Stenberg* predates the Michigan statute by five years. Further, in *Taft*, we fully upheld an Ohio statute pertaining to such procedures the year before the Michigan statute was passed. Michigan could have simply copied that statute word-for-word, and been virtually guaranteed a favorable result in the courts of this Circuit. It instead opted to use statutory language that pushed almost every boundary that the Supreme Court has imposed for these types of laws, and which have recently been reaffirmed in *Gonzales*. Because the statute cannot be squared in any way with these limitations, and the Attorney General's opinion is similarly inconsistent with the relevant court decisions and with the statute itself, the district court correctly determined that invalidation is the only available course.

We therefore affirm the district court's entry of summary judgment in favor of Plaintiffs on the basis of its determination that the Act imposes an undue burden on a woman's right to terminate her pregnancy under *Stenberg*. We also affirm the district court's denial of STTOP's motions for intervention.