COLE, J., delivered the opinion of court in which MARTIN, DAUGHTREY, MOORE, CLAY, WHITE, STRANCH, and DONALD, JJ., joined; and BATCHELDER, C.J., and GIBBONS, ROGERS, SUTTON, COOK, and GRIFFIN, JJ., joined in Part II.B and C. BOGGS, J. (pp. 491-93), delivered a separate dissenting opinion, in which BATCHELDER, C.J., joined. GIBBONS (pp. 493-505), delivered a separate dissenting opinion, in which BATCHELDER, C.J., and ROGERS, SUTTON, and COOK, JJ., joined, and GRIFFIN, J., joined with the exception of Part III. ROGERS (pg. 505) delivered a separate dissenting opinion, in which COOK, J., joined. SUTTON (pp. 505-11), delivered a separate dissenting opinion in which BATCHELDER, C.J., and BOGGS and COOK, JJ., joined. GRIFFIN, J. (pp. 511-14), delivered a separate dissenting opinion.
OPINION
COLE, Circuit Judge.
A student seeking to have her family’s alumni connections considered in her application to one of Michigan’s esteemed public universities could do one of four things to have the school adopt a legacy-conscious admissions policy: she could lobby the admissions committee, she could petition the leadership of the university, she could seek to influence the school’s governing board, or, as a measure of last resort, she could initiate a statewide campaign to alter the state’s constitution. The same cannot be said for a black student seeking the adoption of a constitutionally permissible race-conscious admissions policy. That student could do only one thing to effect change: she could attempt to amend the Michigan Constitution — a lengthy, expensive, and arduous process — to repeal the consequences of Proposal 2. The existence of such a comparative structural burden undermines the Equal Protection Clause’s guarantee that all citizens ought to have equal access to the tools of political change. We therefore REVERSE the judgment of the district court on this issue and find Proposal 2 unconstitutional. We AFFIRM the denial of the University Defendants’ motion to be dismissed as parties, and we AFFIRM the grant of the Cantrell Plaintiffs’ motion for summary judgment as to Russell.
I.

A. Factual Background

These appeals are before us as an epilogue to the long-running battle over the use of race-conscious admissions policies at Michigan’s public colleges and universities. *471 The saga began during the 1960s and 1970s, when racial minorities first successfully lobbied for the adoption of such policies. They remained largely in place until challenges in the late 1990s culminated in the Supreme Court’s decisions in Gratz v. Bollinger, 539 U.S. 244, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003), and Grutter v. Bollinger, 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003), which held that “universities cannot establish quotas for members of certain racial groups” or treat their applications uniquely. Grutter, 539 U.S. at 334, 123 S.Ct. 2325. But the Court allowed universities to continue “considering] race or ethnicity more flexibly as a ‘plus’ factor in the context of individualized consideration,” along with other relevant factors, id., a holding we do not today address or upset.
Following these decisions, Ward Connerly, a former University of California Regent who had championed a similar proposition in California, and Jennifer Gratz, the lead plaintiff in Gratz, mobilized to place on Michigan’s November 2006 statewide ballot a proposal to amend the Michigan Constitution “to prohibit all sex- and race-based preferences in public education, public employment, and public contracting. ...” Operation King’s Dream v. Connerly, 501 F.3d 584, 586 (6th Cir.2007). The initiative — officially designated Proposal 06-2 but commonly known as “Proposal 2” — sought “to amend the State Constitution to ban affirmative action programs.” See Notice of State Proposals for November 7, 2006 General Election, http:// www.michigan.gov/documents/sos/ED-138_ State_Prop_ll-06_174276_7.pdf, at 5 (last visited May 22, 2012). Though Proposal 2 “found its way on the ballot through methods that undermine[d] the integrity and fairness of our democratic processes,” Operation King’s Dream, 501 F.3d at 591, once there, it garnered enough support among Michigan voters to pass by a margin of 58% to 42%.
Proposal 2 amended the Michigan Constitution to include the following provisions, entitled “Affirmative action,” in Article I:
(1) The University of Michigan, Michigan State University, Wayne State University, and any other public college or university, community college, or school district shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.
(2) The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.
(3) For the purposes of this section “state” includes, but is not necessarily limited to, the state itself, any city, county, any public college, university, or community college, school district, or other political subdivision or governmental instrumentality of or within the State of Michigan not included in sub-section 1.
Mich. Const, art. I, § 26. Proposal 2 took effect in December 2006 and wrought two significant changes to the admissions policies at Michigan’s public colleges and universities. First, it eliminated the consideration of “race, sex, color, ethnicity, or national origin” in individualized admissions decisions, modifying policies in place for nearly a half-century. No other admissions criterion — for example, grades, athletic ability, geographic diversity, or family alumni connections — suffered the same fate. Second, Proposal 2 entrenched this prohibition at the state constitutional *472 level, thus preventing public colleges and universities or their boards from revisiting this issue — and only this issue — without repeal or modification of article I, section 26 of the Michigan Constitution.

B. Procedural History

The litigation surrounding Proposal 2 has been lengthy and complex. On November 8, 2006, the day after Proposal 2 passed, a collection of interest groups and individuals, including the Coalition to Defend Affirmative Action, Integration and Immigration Rights and Fight for Equality By Any Means Necessary (“Coalition Plaintiffs”), filed suit in the United States District Court for the Eastern District of Michigan. They named as defendants then-Governor Jennifer Granholm, the Regents of the University of Michigan, the Board of Trustees of Michigan State University, and the Board of Governors of Wayne State University (“University Defendants”), and alleged that the provisions of Proposal 2 affecting public colleges and universities violated the United States Constitution and federal statutory law. The Coalition Plaintiffs limited their request for relief to Proposal 2 as it applies to public education, and did not challenge its constitutionality as it applies to public employment or public contracting. About a month later, the Michigan Attorney General (“Attorney General”) filed a motion to intervene as a defendant, which the district court granted. Shortly thereafter, Eric Russell, then an applicant to the University of Michigan Law School, and Toward A Fair Michigan (“TAFM”), a nonprofit corporation formed to ensure implementation of Proposal 2, also filed a motion to intervene in the litigation.
On December 19, 2006, a group of faculty members and prospective and current students at the University of Michigan (“Cantrell Plaintiffs”) filed a separate but similar suit in the United States District Court for the Eastern District of Michigan against Granholm. This lawsuit also limited its challenge to Proposal 2 as it applies to public education.
That same day, the district court issued what was, in effect, a preliminary injunction, postponing the application of Proposal 2 to the universities’ admissions and financial-aid policies until July 1, 2007, which was the conclusion of the 2006-2007 admissions and financial-aid cycle. The district court’s order stemmed from a stipulation among the University Defendants, Coalition Plaintiffs, Granholm, and the Attorney General consenting to the injunction. Coal. to Defend Affirmative Action v. Granholm (Coal. I), No. 06-15024, 2006 WL 3953321 (E.D.Mich. Dec. 19, 2006). While awaiting approval as intervenors, Russell and TAFM opposed the Attorney General’s stipulation and sought a stay of the injunction from the district court. When two days passed without a ruling on their motions, Russell and TAFM filed with us an “Emergency Motion for a Stay Pending Appeal,” which we granted. Coal. to Defend Affirmative Action v. Granholm (Coal. II), 473 F.3d 237, 253 (6th Cir.2006), application to vacate stay denied, 549 U.S. 1176, 127 S.Ct. 1146, 166 L.Ed.2d 909 (2007). Meanwhile, we approved the district court’s decision to allow only Russell to intervene in the Proposal 2 litigation. Coal. to Defend Affirmative Action v. Granholm (Coal. III), 501 F.3d 775 (6th Cir.2007).
On October 5, 2007, the Cantrell Plaintiffs filed a motion for summary judgment as to Russell, arguing that he should be dismissed from the litigation because he no longer represented an interest distinct from that of the Attorney General. On October 17, 2007, the University Defendants filed a motion to dismiss on the ground that they were not necessary parties to the litigation. On November 30, *473 2007, the Attorney General filed a motion to dismiss for lack of standing or, in the alternative, a motion for summary judgment on the merits as to all Plaintiffs. Russell and the Cantrell Plaintiffs likewise filed motions for summary judgment the same day.
On March 18, 2008, the district court issued two orders addressing these motions. First, the court denied the University Defendants’ request to be dismissed as parties and the Cantrell Plaintiffs’ motion for summary judgment. Coal. to Defend Affirmative Action v. Regents of the Univ. of Mich. (Coal. IV), 539 F.Supp.2d 924, 941, 950-58 (E.D.Mich.2008). The court also granted the Attorney General’s motion for summary judgment, rejecting the Plaintiffs’ arguments that Proposal 2 violated the Equal Protection Clause of the Fourteenth Amendment. Id. at 960. Second, the court granted the Cantrell Plaintiffs’ motion for summary judgment, dismissing Russell as an intervenor. Coal. to Defend Affirmative Action v. Regents of the Univ. of Mich. (Coal. V), 539 F.Supp.2d 960 (E.D.Mich.2008). The Cantrell Plaintiffs subsequently moved the court to reconsider the first order, but the court denied the motion. Coal. to Defend Affirmative Action v. Regents of the Univ. of Mich. (Coal. VI), 592 F.Supp.2d 948 (E.D.Mich.2008).
The Plaintiffs, the University Defendants, and Russell appealed these orders to this Court. A panel of this Court reversed the district court’s grant of summary judgment in favor of the Attorney General, concluding that the portions of Proposal 2 that affect Michigan’s public institutions of higher education impermissibly alter the political process in violation of the Equal Protection Clause. Coal. to Defend Affirmative Action v. Regents of the Univ. of Mich. (Coal. VII), 652 F.3d 607, 631-32 (6th Cir.2011). This Court also affirmed the district court’s dismissal of Russell and the denial of the University Defendants’ motion to be dismissed. The Attorney General then sought en banc review, which we granted, vacating the panel opinion.
II.

A. Constitutionality of Proposal 2

The Equal Protection Clause provides that “[n]o state shall ... deny to any person ... the equal protection of the laws.” U.S. Const, amend. XIV. The Plaintiffs argue that Proposal 2 violates this provision in two distinct ways. Both Plaintiff groups argue that Proposal 2 violates the Equal Protection Clause by impermissibly restructuring the political process along racial lines (the “political process” argument), and the Coalition Plaintiffs additionally argue that Proposal 2 violates the Equal Protection Clause by impermissibly classifying individuals on the basis of race (the “traditional” argument).
In addressing the Plaintiffs’ arguments, we are neither required nor inclined to weigh in on the constitutional status or relative merits of race-conscious admissions policies as such. This case does not present us with a second bite at Gratz and Grutter — despite the best efforts of the dissenters to take one anyway. This case instead presents us with a challenge to the constitutionality of a state amendment that alters the process by which supporters of permissible race-conscious admissions policies may seek to enact those policies. In other words, the sole issue before us is whether Proposal 2 runs afoul of the constitutional guarantee of equal protection by removing the power of university officials to even consider using race as a factor in admissions decisions — something they are specifically allowed to do under Grutter.
*474 We review de novo a district court’s grant of summary judgment and denial of a motion for reconsideration of that decision. Chen v. Dow Chem. Co., 580 F.3d 394, 400 (6th Cir.2009); Cockrel v. Shelby Cnty. Sch. Dist., 270 F.3d 1036, 1047 (6th Cir.2001). Whether a state’s constitution violates the federal constitution is a question of law, which we also review de novo. Cherry Hill Vineyards, LLC v. Lilly, 553 F.3d 423, 431 (6th Cir.2008).

1. Equal Protection Within the Political Process

The Equal Protection Clause “guarantees racial minorities the right to full participation in the political life of the community. It is beyond dispute ... that given racial or ethnic groups may not be denied the franchise, or precluded from entering into the political process in a reliable and meaningful manner.” Washington v. Seattle Sch. Dist. No. 1, 458 U.S. 457, 467, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982). But the Equal Protection Clause reaches even further, prohibiting “a political structure that treats all individuals as equals, yet more subtly distorts governmental processes in such a way as to place special burdens on the ability of minority groups to achieve beneficial legislation.” Id. (internal quotation marks and citation omitted). “[T]he State may no more disadvantage any particular group by making it more difficult to enact legislation in its behalf than it may dilute any person’s vote or give any group a smaller representation than another of comparable size.” Hunter v. Erickson, 393 U.S. 385, 393, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969).
The Supreme Court’s statements in Hunter and Seattle emphasize that equal protection of the laws is more than a guarantee of equal treatment under existing law. It is also a guarantee that minority groups may meaningfully participate in the process of creating these laws and the majority may not manipulate the channels of change so as to place unique burdens on issues of importance to them. In effect, the political-process doctrine hews to the unremarkable notion that when two competitors are running a race, one may not require the other to run twice as far or to scale obstacles not present in the first runner’s course. Ensuring the fairness of the political process is particularly important because an electoral minority is disadvantaged by definition in its attempts to pass legislation; this is especially true of “discrete and insular minorities,” who face unique additional hurdles. Cf. United States v. Carolene Prods. Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938).
Ensuring a fair political process is nowhere more important than in education. Education is the bedrock of equal opportunity and “the very foundation of good citizenship.” Brown v. Bd. of Educ., 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Safeguarding the guarantee “that public institutions are open and available to all segments of American society, including people of all races and ethnicities, represents a paramount government objective.” Grutter, 539 U.S. at 331-32, 123 S.Ct. 2325 (internal quotation marks omitted). Moreover, universities “represent the training ground for a large number of our Nation’s leaders.... [T]o cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity.” Id. at 332, 123 S.Ct. 2325 (citation omitted). Therefore, in the high-stakes context of education, we must apply the political-process doctrine with the utmost rigor.
Of course, the Constitution does not protect minorities from political defeat: Poli *475 tics necessarily produces winners and losers. We must therefore have some way to differentiate between the constitutional and the impermissible. And Hunter and Seattle provide just that. They set the benchmark for when the majority has not only won, but has rigged the game to reproduce its success indefinitely.
a. Hunter v. Erickson
In Himter, the citizens of Akron, Ohio, overturned a fair housing ordinance enacted by the City Council. 393 U.S. at 386, 89 S.Ct. 557. But the citizens did more than merely repeal the ordinance; they amended the city charter through a referendum to require the approval of an electoral majority before any ordinance regulating real estate “on the basis of race, color, religion, national origin or ancestry” — past or future — could take effect. Id. at 387, 390 n. 6, 89 S.Ct. 557. In other words, only ordinances based on those factors required a city-wide majority; ordinances based on any other factor required just a vote by the City Council:
[T]he amendment changed the requirements for the adoption of one type of local legislation: to enact an ordinance barring housing discrimination on the basis of race or religion, proponents had to obtain the approval of the City Council and of a majority of the voters citywide. To enact an ordinance preventing housing discrimination on other grounds, or to enact any other type of housing ordinance, proponents needed the support of only the City Council.
Seattle, 458 U.S. at 468, 102 S.Ct. 3187 (describing Hunter). The referendum halted operation of the existing fair housing ordinance, and more importantly for our purposes, erected a barrier to any similar ordinance in the future. Hunter, 393 U.S. at 389-90, 89 S.Ct. 557.
The Supreme Court found that the disparity between the process for enacting a future fair housing ordinance and the process for enacting any other housing ordinance “place[d] special burden[s] on racial minorities within the governmental process” by making it “substantially more difficult to secure enactment” of legislation that would be to their benefit. Id. at 390-91, 89 S.Ct. 557. While the enactment “treat[ed] Negro and white, Jew and gentile in an identical manner,” the Court found that “the reality is that the law’s impact falls on the minority.” Id. at 391, 89 S.Ct. 557. That the law had been enacted via a popular referendum did not save it from working “a real, substantial, and invidious denial of the equal protection of the laws.” Id. at 393, 89 S.Ct. 557.
b. Washington v. Seattle School District No. 1
In Seattle, a case that mirrors the one before us, the Supreme Court applied Hunter to strike down a state statute, also enacted via a referendum, that prohibited racially integrative busing. Seattle, 458 U.S. at 463, 102 S.Ct. 3187. Prior to the referendum, Seattle School District No. 1 (“District”) had implemented a school desegregation plan that made extensive use of mandatory reassignments. Id. at 460-61,102 S.Ct. 3187. The District was under no obligation to adopt this plan: following Brown, school boards had been “charged with the affirmative duty to take whatever steps might be necessary” to integrate schools that were unconstitutionally segregated because of racial discrimination, Green v. Cnty. Sch. Bd., 391 U.S. 430, 437, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), but there had been no finding that the de facto segregation in Seattle’s schools was the product of discrimination. Nonetheless, the school board implemented the plan to accelerate its existing program of voluntary busing, which some constituencies *476 saw as insufficiently alleviating racial imbalances.[1] Seattle, 458 U.S. at 460, 102 S.Ct. 3187.
In response, Seattle residents drafted a statewide measure — known as Initiative 350 — providing in relevant part that “no school board ... shall directly or indirectly require any student to attend a school other than the school which is geographically nearest or next nearest the student’s place of residence.... ” Id. at 462, 102 S.Ct. 3187 (alteration in original) (quoting Wash. Rev.Code § 28A.26.010 (1981)). Though the initiative was framed as a general ban on mandatory busing, its myriad exceptions made its real effect the elimination of school reassignments for racial purposes only, except where a court ordered such reassignments to remedy unconstitutional segregation. Id. at 462-63, 102 S.Ct. 3187. Initiative 350 made it on the Washington ballot and passed by a substantial margin. Id. at 463, 102 S.Ct. 3187.
The Court found that Initiative 350, like the Akron city charter amendment, violated the Equal Protection Clause. Id. at 487, 102 S.Ct. 3187. The Court stated that its prior cases yielded a “simple but central principle”: while “laws structuring political institutions or allocating political power according to neutral principles” do not violate the Fourteenth Amendment, “a different analysis is required when the State allocates governmental power non-neutrally, by explicitly using the racial nature of a decision to determine the decisionmaking process.” Seattle, 458 U.S. at 469-70, 102 S.Ct. 3187. Echoing Hunter, the Court explained that this distinct analysis is necessary because non-neutral allocations of power “placet ] special burdens on racial minorities within the governmental process, thereby making it more difficult for certain racial and religious minorities than for other members of the community to achieve legislation that is in their interest.” Id. at 470, 102 S.Ct. 3187 (internal quotation marks, citations, and brackets omitted). The Court dismissed the argument that Initiative 350 was not intended to prevent busing for racially-integrative purposes, and explained why Initiative 350 violated this “simple but central” principle.
As a threshold matter, the Court concluded that the busing program, like the fair housing ordinance in Hunter, “at bottom inures primarily to the benefit of the minority, and is designed for that purpose.” Id. at 472, 102 S.Ct. 3187. The Court reasoned that while “white as well as Negro children benefit from exposure to ethnic and racial diversity in the classroom,” desegregation primarily benefits minority children because these children “can achieve their full measure of success only if they learn to function in — and are fully accepted by — the larger community. Attending an ethnically diverse school may help accomplish this goal by preparing minority children for citizenship in our pluralistic society.” Id. at 472-73, 102 S.Ct. 3187 (internal quotation marks omitted). Because racial minorities had reason to “consider busing for integration to be ‘legislation that is in their interest,’ ” the “racial focus of Initiative 350 ... suffice[d] to trigger application of the Hunter doctrine.” Id. at 474, 102 S.Ct. 3187 (quoting Hunter, 393 U.S. at 395, 89 S.Ct. 557 (Harlan, J., concurring)).
*477 Having concluded that Initiative 350 targeted a busing program that “inures primarily to the benefit of the minority,” the Court held that “the practical effect of Initiative 350 is to work a reallocation of power of the kind condemned in Hunter.” Id. As the Court explained, Initiative 350 did more than merely repeal the busing program:
The initiative removes the authority to address a racial problem — and only a racial problem — from the existing decisionmaking body, in such a way as to burden minority interests. Those favoring the elimination of de facto school segregation now must seek relief from the state legislature, or from the statewide electorate. Yet authority over all other student assignment decisions, as well as over most other areas of educational policy, remains vested in the local school board.... As in Hunter, then, the community’s political mechanisms are modified to place effective decisionmaking authority over a racial issue at a different level of government.
Id. By removing authority over busing for racial purposes from the school board and placing it at a more remote level of government, Initiative 350 required “those championing school integration to surmount a considerably higher hurdle than persons seeking comparable legislative action,” and disadvantaged “those who would benefit from laws barring defacto desegregation as against those who ... would otherwise regulate student assignment decisions.” Id. at 474-75, 102 S.Ct. 3187 (alteration in original) (internal quotation marks omitted). Accordingly, the Court held that Initiative 350 violated the Equal Protection Clause. Id. at 470, 102 S.Ct. 3187.
In sum, Hunter and Seattle require us to examine an enactment that changes the governmental decisionmaking process for legislation with a racial focus to determine if it improperly manipulates the channels for change.[2] Seattle, 458 U.S. at 470, 485, 102 S.Ct. 3187; Hunter, 393 U.S. at 391, 89 S.Ct. 557; cf. Carolene Prods., 304 U.S. at 152 n. 4, 58 S.Ct. 778 (noting that more exacting judicial scrutiny is required when the majority curtails “the operation of those political processes ordinarily to be relied upon to protect minorities”). To the extent that it does, we must strike down the enactment absent a compelling state interest.
2. Application of the Hunter/Seattle Test to Proposal 2
Hunter and Seattle thus expounded the rule that an enactment deprives minority groups of the equal protection of the laws when it: (1) has a racial focus, targeting a policy or program that “inures primarily to the benefit of the minority”; and (2) reallocates political power or reorders the decisionmaking process in a way that places special burdens on a minority group’s ability to achieve its goals through that process. See Seattle, 458 U.S. at 467, 472, 102 S.Ct. 3187; Hunter, 393 U.S. at 391, 89 S.Ct. 557. Applying this rule here, we conclude that Proposal 2 targets a program that “inures primarily to the benefit of the minority” and reorders the political process in Michigan in a way that places special burdens on racial minorities.

*478
a. Racial Focus

The first prong of the Hunter/Seattle test requires us to determine whether Proposal 2 has a “racial focus.” Seattle, 458 U.S. at 474, 102 S.Ct. 3187. This inquiry turns on whether the targeted policy or program, here holistic race-conscious admissions policies at public colleges and universities, “at bottom inures primarily to the benefit of the minority, and is designed for that purpose.” Id at 472, 102 S.Ct. 3187. The targeted policy need not be for the sole benefit of minorities, for “it is enough that minorities may consider [the now burdened policy] to be ‘legislation that is in their interest.’ ” Id at 474, 102 S.Ct. 3187 (quoting Hunter, 393 U.S. at 395, 89 S.Ct. 557 (Harlan, J., concurring)).[3]
Seattle conclusively answers whether a law targeting policies that seek to facilitate classroom diversity, as Proposal 2 does, has a racial focus. In Seattle, the Court observed that programs intended to promote school diversity and further the education of minority children enable these students to “achieve their full measure of success.” Id at 472-73, 102 S.Ct. 3187. Such programs do so through “preparing minority children for citizenship in our pluralistic society, while ... teaching members of the racial majority to live in harmony and mutual respect with children of minority heritage.” Id at 473, 102 S.Ct. 3187 (internal quotation marks and citation omitted). Accordingly, the Court noted that “desegregation of the public schools ... at bottom inures primarily to the benefit of the minority....” Id at 472, 102 S.Ct. 3187. Because minorities could “consider busing for integration to be ‘legislation that is in their interest,’ ” the Court concluded that Initiative 350’s effective repeal of such programs had a racial focus sufficient to “trigger application of the Hunter doctrine.” Id at 474, 102 S.Ct. 3187.
The logic of the Court’s decision in Seattle applies with equal force here. Proposal 2 targets race-conscious admissions policies that “promote[] ‘cross-racial understanding,’ help[] to break down racial stereotypes, and ‘enablef ] students to better understand persons of different races.’ ” Grutter, 539 U.S. at 330, 123 S.Ct. 2325 (alteration omitted) (internal quotation marks and citation omitted). Just as an integrative busing program is designed to improve racial minorities’ representation at certain public schools, see Seattle, 458 U.S. at 461, 102 S.Ct. 3187, race-conscious admissions policies are designed to increase racial minorities’ representation at institutions of higher education, see, e.g., Grutter, 539 U.S. at 316, 328-33, 123 S.Ct. 2325; Gratz, 539 U.S. at 253-56, 123 S.Ct. 2411. There is no material difference between the enactment in Seattle and Proposal 2, as both targeted policies that benefit minorities by enhancing their educational opportunities and promoting classroom diversity. Further, given that racial minorities lobbied for the implementation of the very policies that Proposal 2 permanently eliminates, it is beyond question that Proposal 2 targets policies that “minorities may consider ... *479 [to be] in their interest.” Seattle, 458 U.S. at 474, 102 S.Ct. 3187. Therefore, Proposal 2 has a racial focus because race-conscious admissions policies at Michigan’s public colleges and universities “inure[] primarily to the benefit of the minority, and [are] designed for that purpose.” Id. at 472, 102 S.Ct. 3187.
Seattle not only mandates our conclusion that Proposal 2 is racially focused, but it also dispels any notion that the benefit race-conscious admissions policies may confer on the majority undercuts its “racial focus.” Although it is true that increased representation of racial minorities in higher education benefits all students, see Grutter, 539 U.S. at 327-33, 123 S.Ct. 2325; Seattle, 458 U.S. at 472-73, 102 S.Ct. 3187, the Supreme Court has made clear that these policies still have a racial focus. In Seattle, the Court recognized that it is “clear that white as well as Negro children benefit from exposure to ethnic and racial diversity in the classroom.” Seattle, 458 U.S. at 472, 102 S.Ct. 3187 (internal quotation marks omitted). But the Seattle Court found that the wider benefits of the busing plan did not serve to distinguish Hunter, “for we may fairly assume that members of the racial majority both favored and benefited from Akron’s fair housing ordinance.” Id. By the same token, the wider benefits of race-conscious admissions policies do not undermine the conclusion that such admissions policies “inure[] primarily to the benefit of the minority____” Id.
Nor do policy arguments attacking the wisdom of race-conscious admissions programs preclude our finding that these programs “inure[ ] primarily to the benefit of the minority.” Id. Critics of affirmative action maintain that race-conscious admissions policies actually harm minorities by stigmatizing minority students admitted into high-caliber institutions through a perception that they lack sufficient qualifications; by impeding the academic success of minority students admitted to institutions they are not qualified to attend; and by impairing the admissions prospects of traditionally higher-performing minority groups, such as Asian-Americans. But the controversy surrounding the policies that Proposal 2 targets is irrelevant as to whether Proposal 2 itself has a racial focus; rather, this controversy is a “matterf] to be resolved through the political process.” Id. at 474, 102 S.Ct. 3187 (“It is undeniable that busing for integration ... engenders considerably more controversy than does the sort of fair housing ordinance debated in Hunter. But in the absence of a constitutional violation, the desirability and efficacy of school desegregation are matters to be resolved through the political process.”). As in Seattle, “it is enough that minorities may consider [the repealed policy] to be ‘legislation that is in their interest.’” Id. (quoting Hunter, 393 U.S. at 395, 89 S.Ct. 557 (Harlan, J., concurring)).
We find that the holistic race-conscious admissions policies now barred by Proposal 2 inure primarily to the benefit of racial minorities, and that such groups consider these policies to be in their interest. Indeed, we need not look further than the approved ballot language — characterizing Proposal 2 as an amendment “to ban affirmative action programs” — to confirm that this legislation targets race-conscious admissions policies and, insofar as it prohibits consideration of applicants’ race in admissions decisions, that it has a racial focus.[4]

*480
b. A Reordering of the Political Process That Burdens Racial Minorities

The second prong of the Hunter/Seattle test asks us to determine whether Proposal 2 reallocates political power or reorders the political process in a way that places special burdens on racial minorities. See Seattle, 458 U.S. at 467, 102 S.Ct. 3187; Hunter, 393 U.S. at 391, 89 S.Ct. 557. We must first resolve (1) whether the affected admissions procedures lie within the “political process,” and then (2) whether Proposal 2 works a “reordering” of this political process in a way that imposes “special burdens” on racial minorities.

i Proposal 2’s Effect on a “Political Process”

The breadth of Proposal 2’s influence on a “political process” turns on the role the popularly elected governing boards of the universities play in setting admissions procedures. The key question is whether the boards had the power to alter the universities’ admissions policies prior to the enactment of Proposal 2. If the boards had that power and could influence the use (or non-use) of race-conscious admissions policies, then Proposal 2’s stripping of that power works a reordering of the political process because minorities can no longer seek to enact a type of legislation that is in their interest at the board level. But if board members lacked such power, because policy decisions are actually under the control of politically unaccountable faculty members or admissions committees, then Proposal 2’s effect on the political process is negligible.
This issue — whether the admissions policies affected by Proposal 2 are part of a “political process” — was the subject of stark disagreement between the majority and the dissent when this case was originally before a three-judge panel, and it continues to be here. In supplemental briefing, the University Defendants clarified their admissions practices, undercutting the factual and legal basis of the panel dissent’s core contention that Proposal 2 falls outside the political process. We examine the administrative structure of Michigan’s public universities and their admissions processes in light of this new information, even though the dissenters choose to look the other way.
The Michigan Constitution establishes three public universities — the University of Michigan, Michigan State University, and Wayne State University — and grants control of each to a governing board.[5] Mich. Const, art. VIII, § 5; see also id. § 6 (allowing the establishment of other institutions of higher learning, such as Michigan’s other public colleges and universities, and affording their governing boards similar control). These boards have the same role: to run, with plenary authority, their respective institutions. Id. art. VIII, §§ 5-6; Glass v. Dudley Paper Co., 365 Mich. 227, 112 N.W.2d 489, 490 (1961). Michigan law has consistently confirmed this absolute authority. See, e.g., Glass, 112 N.W.2d at 490; Att’y Gen. ex rel. Cook v. Burhans, 304 Mich. 108, 7 *481 N.W.2d 370, 371 (1942); Bd. of Regents of Univ. of Mich. v. Auditor Gen., 167 Mich. 444, 132 N.W. 1037, 1040 (1911); 1979-80 Mich. Op. Att’y Gen. 578, 1980 WL 114008, at *1-2 (Mich.A.G. Jan. 31, 1980). Indeed, the boards are described as “the highest form of juristic person known to the law, a constitutional corporation of independent authority, which, within the scope of its functions, is co-ordinate with and equal to that of the legislature.” Federated Publ’ns, Inc. v. Bd. of Trs. of Mich. State Univ., 460 Mich. 75, 594 N.W.2d 491, 496 n. 8 (1999) (quoting Bd. of Regents of the Univ. of Mich. v. Auditor Gen., 167 Mich. 444, 132 N.W. 1037, 1040 (1911)).
Eight popularly elected individuals sit on these boards, and they hold office for eight years. Mich. Const, art. VIII, § 5; see also id. § 6. The boards have the “power to enact ordinances, by-laws and regulations for the government of the university.” Mich. Comp. Laws § 390.5; see also id. §§ 390.3-.6.[6] Exercising this power, the boards have enacted bylaws — which they have complete authority to revise or revoke — detailing admissions procedures. See Univ. of Mich., Bylaws of the Bd. of Regents § 8.01, available at http://www. regents.umich.edu/bylaws (last visited May 22, 2012) [hereinafter Univ. of Mich. Bylaws]; Mich. State Univ., Bd. of Trs. Bylaws, art. 4, available at http://www. trustees.msu.edu/bylaws (last visited May 22, 2012); Wayne State Univ. Statutes §§ 2.34.09, 2.34.12, available at http:// www.bog.wayne.edu/code (last visited May 22, 2012).
The University of Michigan’s bylaws delegate the day-to-day management of undergraduate admissions to the associate vice provost and executive director of undergraduate admissions. See Univ. of Mich. Bylaws § 8.01. Although the board delegates this responsibility, it continues to exercise ultimate decisionmaking authority because it directly appoints the associate vice provost and executive director of undergraduate admissions, id., and because it retains the power to revoke or alter the admissions framework, id. §§ 14.03, 14.04. Nothing prevents the board from adopting an entirely new framework for admissions decisions if it is so inclined. See Mich. Const, art. VIII, § 5; Mich. Comp. Laws §§ 390.3-.6; Univ. of Mich. Bylaws § 8.01. Indeed, that the board can revise its bylaws is not a mere theoretical possibility, but a reality that occurs with some frequency. Since 2008, the University of Michigan’s Board of Regents has revised more than two dozen of its bylaws, two of which fall within Chapter VIII, the section regulating admissions practices.
Of course power in a large university, a vast and highly complex institution, must be delegated. As such, the board fulfills its general supervisory role by conducting monthly public meetings to remain apprised of all university operations and by exercising its power to amend bylaws or revise delegations of responsibility. See Univ. of Mich. Bylaws §§ 1.01, 14.03. At these meetings, the board regularly discusses admissions practices, including the use of race-conscious admissions policies. See, e.g., Univ. of Mich. Bd. of Regents Proceedings, March 2007, 264-65 (report *482 of Provost to Board of Regents regarding new policies to increase the institution’s diversity in the wake of Proposal 2); Univ. of Mich. Bd. of Regents Proceedings, June 2004, 301 (report of University President to Board of Regents regarding undergraduate admissions policies in light of Gratz, including efforts to encourage minority applicants); Univ. of Mich. Bd. of Regents Proceedings, July 2003, 11 (discussion of the importance of race-conscious admissions policies in light of Grutter, including comments in support of the University’s efforts in Grutter from six Regents and the University President), available at http://quod.hb.umich.edu/cgpt/text/textidx?page==browse&c=umregproc (last visited May 22, 2012). Thus, the elected boards of Michigan’s public universities can, and do, change their respective admissions policies, making the policies themselves part of the political process.[7] But even if they did not, the Attorney General provides no authority to support his contention that an unused power is a power abandoned.
Nevertheless, the Attorney General argues, echoed by the dissenters, that admissions decisions he outside the political process because the governing boards of the universities have “fully delegated” responsibility for establishing admissions standards to politically unaccountable admissions committees and faculty members. But the Michigan Constitution, state statutes, and the universities’ bylaws and current practices directly contradict this argument. Article VIII, section 5 of the Michigan Constitution entrusts the board with “general supervision of its institution.” Mich. Const, art. VIII, § 5. Michigan statutes §§ 390.3-.5 vest full governing authority in the board, including the power to enact bylaws and regulations to promote and achieve the university’s educational mission. See Mich. Comp. Laws §§ 390.3-.5. The University of Michigan bylaws unambiguously retain the power to alter or revoke any bylaw, including any delegation of responsibility. See Univ. of Mich. Bylaws § 14.03. This robust legal authority makes the fact of such delegation irrelevant for our purposes, as the board may revoke the delegation at will.
Moreover, to the extent the Attorney General and the dissenters express concern over the degree to which the board has delegated admissions decisions, that delegation does not affect whether admissions decisions should be considered part of the political process. When an elected body delegates power to a non-elected body for the day-to-day implementation of policy, it does not remove the policy from the political process. In the administrative law context, for example, rule-making powers are delegated from the President to appointed cabinet officials, and as a practical matter, further down to civil service professionals. Regardless of the level at which the rule is drafted, the rule-making process is at all times under the umbrella of the powers of the President. These rules are often the subject of political debate, lobbying, and electioneering, again without regard to who actually drafted the particular rule in question. Without question, federal rule-making is part of the political process. Similarly, whether it is the board or a delegated body that sets the rules for consideration of race in admissions, these decisions fall under the umbrella of the elected board and are thus part of the political process.
*483 Telling evidence that board members can influence admissions policies — bringing such policies within the political process — is that these policies can, and do, shape the campaigns of candidates seeking election to one of the boards. As the boards are popularly elected, citizens concerned with race-conscious admissions policies may lobby for candidates who will act in accordance with their views — whatever they are. Board candidates have, and certainly will continue, to include their views on race-conscious admissions policies in their platforms. See League of Women Voters, 2005 General Election Voter Guide, available at http://www.lwvka.org/guide04/ regents/html (last visited May 22, 2012) (noting that a candidate for the Board of Regents pledged to “work to end so-called ‘Affirmative-Action,’ a racist, degrading system”). Indeed, nothing prevents Michigan citizens from electing a slate of regents who promise to review admissions policies based on their opposition to affirmative action. Once elected, the new slate may revise the bylaws, see Univ. of Mich. Bylaws § 14.03, and change their university’s admissions policies — either by entirely revoking the delegation and handling all admissions policies at the board level or by enacting new bylaws giving more explicit direction to admissions committees. Thus, Proposal 2 affects a “political process.”

ii. Reordering of a “Political Process”

The next issue is whether Proposal 2 reordered the political process in a way that places special burdens on racial minorities. The Supreme Court has found that both implicit and explicit reordering violates the Fourteenth Amendment. See Seattle, 458 U.S. at 474, 102 S.Ct. 3187; Hunter, 393 U.S. at 387, 390, 89 S.Ct. 557. In Hunter, the express language of the charter amendment required any ordinance regulating real estate “on the basis of race, color, religion, national origin or ancestry” to be approved by a majority of the electorate and the City Council, as opposed to solely the City Council for other real-estate ordinances. 393 U.S. at 387, 390, 89 S.Ct. 557. This reallocation of power was directly written into the charter amendment, creating “in effect ... an ‘explicitly racial classification treating racial housing matters differently’ ” from all other housing matters. Seattle, 458 U.S. at 468, 102 S.Ct. 3187 (quoting Hunter, 393 U.S. at 389, 89 S.Ct. 557).
In Seattle, however, the reordering was implicit: On its face, Initiative 350 simply prohibited school boards from using mandatory busing, but its practical effect was to force “[tjhose favoring the elimination of de facto school segregation” to “seek relief from the state legislature, or from the statewide electorate” in order to overturn Initiative 350. Id. at 474, 102 S.Ct. 3187. Nonetheless, “authority over all other student assignment decisions ... remained] vested in the local school board.” Id. Whereas a proponent of smaller class sizes could seek redress at the local level, a proponent of integrative busing had to scale the more onerous hurdle of a successful statewide campaign. The Seattle legislation implicitly reallocated power because the “initiative remove[d] the authority to address a racial problem — and only a racial problem — from the existing decision-making body____” Id. Similar to the amendment in Hunter, Initiative 350 modified “the community’s political mechanisms ... to place effective decisionmaking authority over a racial issue at a different level of government.” Id.
The Seattle Court then clarified what sort of reordering contravenes the political-process doctrine: “[t]he evil condemned by the Hunter Court was not the particular political obstacle of mandatory referenda imposed by the Akron charter amendment; it was, rather, the compara *484 tive structural burden placed on the political achievement of minority interests.” Id. at 474 n. 17, 89 S.Ct. 557 (emphasis added). In both Hunter and Seattle, “the effect of the challenged action was to redraw decisionmaking authority over racial matters— and only over racial matters — in such a way as to place comparative burdens on minorities.” Id. (emphasis added). Thus, any “comparative structural burden,” be it local or statewide or national, satisfies the reordering prong of the Hunter/Seattle test. Id.
The comparative structural burden we face here is every bit as troubling as those in Hunter and Seattle because Proposal 2 creates the highest possible hurdle. This comparative structural burden is most apparent in tracing the channels for change available to a citizen promoting any policy unmodified by Proposal 2 and those available to a citizen promoting constitutionally permissible race-conscious admissions policies.
An interested Michigan citizen may use any number of avenues to change the admissions policies on an issue outside the scope of Proposal 2. For instance, a citizen interested in admissions policies benefit-ting legacy applicants — sons and daughters of alumni of the university — may lobby the admissions committees directly, through written or in-person communication. He may petition higher administrative authorities at the university, such as the dean of admissions, the president of the university, or the university’s board. He may seek to affect the election— through voting, campaigning, or other means — of any one of the eight board members whom the individual believes will champion his cause and revise admissions policies accordingly. And he may campaign for an amendment to the Michigan Constitution.
Each of these methods, respectively, becomes more expensive, lengthy, and complex. Because Proposal 2 entrenched the ban on all race-conscious admissions policies at the highest level, this last resort— the campaign for a constitutional amendment — is the sole recourse available to a Michigan citizen who supports enacting such policies. That citizen must now begin by convincing the Michigan electorate to amend its constitution — an extraordinarily expensive process and the most arduous of all the possible channels for change. Just to place a proposed constitutional amendment repealing Proposal 2 on the ballot would require either the support of two-thirds of both the Michigan House of Representatives and Senate, see Mich. Const, art. XII, § 1, or the signatures of a number of voters equivalent to at least ten percent of the number of votes cast for all candidates for governor in the preceding general election, see id. art. XII, § 2. Once on the ballot, the proposed amendment must then earn the support of a majority of the voting electorate to undo Proposal 2’s categorical ban. See id. art. XII, §§ 1— 2.
Only after traversing this difficult and costly road would our now-exhausted citizen reach the starting point of his neighbor who sought a legacy-related admissions policy change. After this successful constitutional amendment campaign, the citizen could finally approach the university — by petitioning the admissions committees or higher administrative authorities— to request the adoption of race-conscious admissions policies. By amending the Michigan Constitution to prohibit university admissions units from using even modest race-conscious admissions policies, Proposal 2 thus removed the authority to institute any such policy from Michigan’s universities and lodged it at the most remote level of Michigan’s government, the state constitution. As with the unconstitu *485 tional enactment in Hunter, proponents of race-conscious admissions policies now have to obtain the approval of the Michigan electorate and, if successful, admissions units or other university powers— whereas proponents of other non-universal admissions factors need only garner the support of the latter. See Seattle, 458 U.S. at 468, 474, 102 S.Ct. 3187.
The “simple but central principle” of Hunter and Seattle is that the Equal Protection Clause prohibits requiring racial minorities to surmount more formidable obstacles than those faced by other groups to achieve their political objectives. See id. at 469-70, 102 S.Ct. 3187. A state may not “allocate!] governmental power nonneutrally, by explicitly using the racial nature of a decision to determine the decisionmaking process.” Id. at 470, 102 S.Ct. 3187. As the Supreme Court has recognized, such special procedural barriers to minority interests discriminate against racial minorities just as surely as — and more insidiously than — substantive legal barriers challenged under the traditional equal protection rubric. See id. at 467, 102 S.Ct. 3187 (“[T]he Fourteenth Amendment also reaches a political structure that treats all individuals as equals, yet more subtly distorts governmental processes in such a way as to place special burdens on the ability of minority groups to achieve beneficial legislation.”) (internal quotation marks and citations omitted). Because less onerous avenues to effect political change remain open to those advocating consideration of nonracial factors in admissions decisions, Michigan cannot force those advocating for consideration of racial factors to traverse a more arduous road without violating the Fourteenth Amendment. We thus conclude that Proposal 2 reorders the political process in Michigan to place special burdens on minority interests.
3. Objections to the Applicability of the Hunter/Seattle Doctrine to Proposal 2
The Attorney General and the dissenters make a number of arguments as to why Proposal 2 survives constitutional scrutiny. At the outset, it should be noted that adopting these arguments as to Proposal 2’s constitutionality would be particularly ironic, given that these arguments applied with equal force to Initiative 350 in Seattle. While distinctions obviously exist between the policy at issue here and that in Seattle, the factual differences are not so material as to justify departure from relevant Supreme Court precedent.
a. Hunter/Seattle Doctrine and Preferential Treatment Programs
The Attorney General and the dissenters assert that Hunter and Seattle are inapplicable to Proposal 2 because those cases only govern enactments that burden racial minorities’ ability to obtain protection from discrimination through the political process, whereas Proposal 2 burdens racial minorities’ ability to obtain preferential treatment. At bottom, this is an argument that an enactment violates the Equal Protection Clause under Hunter and Seattle only if the political process is distorted to burden legislation providing constitutionally-mandated protections, such as anti-discrimination laws. Under this theory, a state may require racial minorities to endure a more burdensome process than all other citizens when seeking to enact policies that are in their favor if those policies are constitutionally permissible but not constitutionally required. This effort to drive a wedge between the political-process rights afforded when seeking anti-discrimination legislation and so-called *486 preferential treatment is fundamentally at odds with Seattle.
The only way to find the Hunter/Seattle doctrine inapplicable to the enactment of preferential treatment is to adopt a strained reading that ignores the preferential nature of the legislation at issue in Seattle, and inaccurately recast it as anti-discrimination legislation. Initiative 350 prohibited the voluntary busing of students to correct de facto segregation. 458 U.S. at 460-61, 102 S.Ct. 3187. The school board was under no obligation to undertake this effort because there had been no finding that the District’s segregation was the result of intentional racial discrimination. Id. at 491-92, 102 S.Ct. 3187 (Powell, J., dissenting) (“The Court has never held that there is an affirmative duty to integrate the schools in the absence of a finding of unconstitutional segregation. Certainly there is no constitutional duty to adopt mandatory busing in the absence of such a violation.”) (internal citations omitted). As such, the District’s plan was an ameliorative measure and not a response to discrimination. It is therefore inaccurate to suggest that Initiative 350 affected antidiscrimination legislation by making it more difficult for minorities to obtain protection from discrimination through the political process. Quite the contrary: as the district court recognized, “[bjecause prohibiting integration (when it is not constitutionally mandated) is not tantamount to discrimination ... the Court in Seattle did not (and could not) rely on the notion that the restructuring at issue impeded efforts to secure equal treatment.”[8] Coal. VI, 592 F.Supp.2d at 951. Therefore, in applying the Hunter political-process framework to an obstacle impeding preferential treatment, the Seattle Court drew no distinction between the equal protection rights at stake in seeking antidiscrimination legislation and those at stake in seeking preferential treatment.
It should be unsurprising, then, that the language of Hunter and Seattle encompasses any legislation in the interest of racial minorities, and thus is broader than it would be were the distinction urged by the Attorney General and the dissenters valid. See, e.g., Seattle, 458 U.S. at 467, 102 S.Ct. 3187 (noting that the Fourteenth Amendment protects against distortions of the political process that “place special burdens on the ability of minority groups to achieve beneficial legislation”) (emphasis added); id. at 470, 102 S.Ct. 3187 (requiring searching judicial scrutiny where state action makes it more difficult for *487 racial minorities “to achieve legislation that is in their interest”) (emphasis added) (internal quotation marks omitted); id. at 474, 102 S.Ct. 3187 (finding it “enough that minorities may consider busing for integration to be legislation that is in their interest”) (emphasis added) (internal quotation marks omitted); Hunter, 393 U.S. at 393, 89 S.Ct. 557 (“[T]he State may no more disadvantage any particular group by making it more difficult to enact legislation in its behalf than it may dilute any person’s vote....”) (emphasis added).
This language makes clear that the Hunter!Seattle doctrine works to prevent the placement of special procedural obstacles on minority objectives, whatever those objectives may be. The distinction urged by the Attorney General and the dissenters thus erroneously imposes an outcome-based limitation on a process-based right. What matters is whether racial minorities are forced to surmount procedural hurdles in reaching their objectives over which other groups do not have to leap. If they are, the disparate procedural treatment violates the Equal Protection Clause, regardless of the objective sought.

b. Proposal 2 as a Mere Repeal

Latching on to the Supreme Court’s observation that “the simple repeal or modification of desegregation or antidiscrimination laws, without more, never has been viewed as embodying a presumptively invalid racial classification,” Crawford v. Bd. of Educ., 458 U.S. 527, 539, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982); accord Hunter, 393 U.S. at 390 n. 5, 89 S.Ct. 557; Seattle 458 U.S. at 483, 102 S.Ct. 3187, the Attorney General implores us to classify Proposal 2 as a mere repeal of the universities’ race-conscious admissions policies, rather than the kind of political restructuring that implicates the Hunter/Seattle doctrine. Crawford, a case decided the same day as
Seattle, emphasizes the difference between mere repeals and political restructuring; state actors must retain the power to repeal policies without running afoul of the political-process doctrine — certainly not every policy elimination carries with it a political-process violation. See 458 U.S. at 540, 102 S.Ct. 3211. Crawford brings this difference into focus, because the Court-approved political action in that case (amendment of the California Constitution) occurred at the same level of government as the original enactment (a prior amendment of the California Constitution), thus leaving the rules of the political game unchanged. Id.
The Supreme Court has twice distinguished the “mere repeal” at issue in Crawford from the political reordering at issue in Hunter and Seattle. The Crawford Court distinguished Hunter by clarifying that the charter amendment in Hunter was “something more than a mere repeal” because it not only repealed an ordinance adopted by the popularly elected City Council, it removed from the Council the power to reinstate it — more than just undoing an unpopular act, the electorate in Hunter had altered the framework of the political process. Crawford, 458 U.S. at 541, 102 S.Ct. 3211. The Seattle Court drew the same distinction between the Washington State legislation and the California amendment: it found that Initiative 350 “works something more than the ‘mere repeal’ of a desegregation law by the political entity that created it ... by lodging decisionmaking authority over the question at a new and remote level of government.” Seattle, 458 U.S. at 483, 102 S.Ct. 3187. Just as in Hunter, the electorate in Seattle changed the rules of the political process.
Here, the rules are not the same after Proposal 2. Rather than undoing an act of popularly elected officials by simply repealing the policies they created, Michi *488 gan voters repealed the admissions policies that university officials created and took the additional step of permanently removing the officials’ power to reinstate them. In short, Proposal 2 “works something more than the ‘mere repeal’ of a desegregation law by the political entity that created it.” Id. Had those favoring elimination of all race-conscious admissions policies successfully lobbied the universities’ admissions units, just as racial minorities did to have these policies adopted in the first place, there would be no equal protection concern. Rather, like Initiative 350 did for any future attempt to implement integrative busing (and the Akron city charter amendment did for any future attempt to enact a fair housing ordinance), Proposal 2 “burdens all future attempts” to implement race-conscious admissions policies “by lodging decisionmaking authority over the question at a new and remote level of government.” Id.
This reallocation of decisionmaking authority at a “new and remote level of government” distinguishes the instant case from Crawford. See id. Certainly, should Michigan’s public universities want to abolish these race-conscious admissions policies, the admissions committees, the universities’ presidents and provosts, and the universities’ boards remain free to repeal them, without any infringement on the right to equal protection in the political process. The avenues of change available to Michigan’s public universities parallel those available to the District in Seattle. In ruling the statewide repeal of the voluntary busing plan unconstitutional, the Seattle Court required any appeal to occur through local government, where the plan was originally enacted. Our decision no more entrenches a race-conscious policy than the Supreme Court’s decisions in Seattle or Hunter. Indeed, while the dissenting opinions accuse us of judicially enshrining the presumptively invalid policy of considering race as one factor in holistic admissions determinations, we take no such step.[9]
More generally, the dissenting opinions criticize our holding today in broad and strident terms. At their core, these opinions express disapproval of the political-process doctrine itself, dissatisfaction that Grutter allowed for even modest race-conscious admissions policies, and incredulity at the possibility that a state constitutional amendment forbidding consideration of race could violate the Equal Protection Clause. But Hunter and Seattle have not been overruled; Grutter continues to permit the same holistic race-conscious admissions policies Proposal 2 seeks to permanently eliminate; and courts must decide equal protection challenges by application of precedent, rather than resort to syllogism. Most importantly, our holding does not place race-conscious admissions policies beyond the political process. Opponents of affirmative action remain free to advocate for their preferred policies in the same manner and at the same level of government as its proponents.
A Constitutionality of Proposal 2 Under the Political-Process Doctrine
Proposal 2 modifies Michigan’s political process “to place special burdens on the ability of minority groups to achieve beneficial legislation.” See id. at 467, 102 S.Ct. 3187. Because Proposal 2 fails the Hunter/Seattle test, it must survive strict scrutiny. See id. at 485 n. 28, 102 S.Ct. 3187. Under the strict scrutiny standard, the Attorney General must prove that Proposal 2 is “necessary to further a compelling state interest.” Crawford, 458 U.S. at 536, *489 102 S.Ct. 3211. In Seattle, the Court did not consider whether a compelling state interest might justify a state’s enactment of a racially-focused law that restructures the political process, because the government made no such argument. 458 U.S. at 485 n. 28, 102 S.Ct. 3187. Likewise, because the Attorney General does not assert that Proposal 2 satisfies a compelling state interest, we need not consider this argument. Therefore, those portions of Proposal 2 that affect Michigan’s public institutions of higher education violate the Equal Protection Clause.[10]

5. Traditional Equal Protection Analysis

Having found that Proposal 2 deprives the Plaintiffs of equal protection of the law under the political-process doctrine, we need not reach the question of whether it also violates the Equal Protection Clause when assessed using the “traditional” analysis.

B. The University Defendants’ Norir-Dismissal

The University Defendants appeal the district court’s denial of their motion to be dismissed as misjoined parties under Rule 21 of the Federal Rules of Civil Procedure. We review the district court’s decision for an abuse of discretion and must affirm unless we are “left with a definite and firm conviction that the trial court committed a clear error of judgment.” Letherer v. Alger Group, L.L.C., 328 F.3d 262, 266 (6th Cir.2003) (internal quotation marks and citation omitted), overruled on other grounds by Powerex Corp. v. Reliant Energy Servs., 551 U.S. 224, 127 S.Ct. 2411, 168 L.Ed.2d 112 (2007).
Rule 21 states in relevant part: “[o]n motion or on its own, the court may at any time, on just terms, add or drop a party.” Fed.R.Civ.P. 21. “The Federal Rules of Civil Procedure do not define misjoinder, but the cases make clear that misjoinder of parties occurs when [parties] fail to satisfy the conditions for permissive joinder under Fed.R.Civ.P. 20(a).” Glendora v. Malone, 917 F.Supp. 224, 227 (S.D.N.Y.1996). Because a motion to be dismissed under Rule 21 tracks Rule 20(a), we must ask whether the Coalition Plaintiffs have satisfied the rules for permissive joinder. Under Rule 20(a), defendants may be joined if “any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and any question of law or fact common to all defendants will arise in the action.” Fed.R.Civ.P. 20(a)(2). “A misjoinder of parties ... frequently is declared because no relief is demanded from one or more of the parties joined as defendants.” Letherer, 328 F.3d at 267 (quoting 7 Charles Alan Wright et al., Federal Practice and Procedure § 1683, at 475-76 (3d ed.2001)).
The district court concluded that the University Defendants were properly joined parties under Rule 20(a) because the Coalition Plaintiffs asserted a request for relief on a claim involving common issues of law and fact. The district court found that “the claims brought against the universities are intertwined with those challenging Proposal 2,” and “[i]f [the court] were to find Proposal 2 unconstitutional, affirmative action would not automatically be reinstated into the admissions process. Rather, the universities would have to choose to do so on their own.” *490 Coal. IV, 539 F.Supp.2d at 941. Because the Coalition Plaintiffs’ traditional equal protection claim could have required the University Defendants to grant relief by reinstating race-conscious admissions policies, the district court found Rule 20(a) satisfied and concluded that dismissal as a misjoined party was not appropriate. See id.
The discretionary language of Rule 21, coupled with our deferential standard of review, presents a high hurdle for reversal of the district court’s determinations. The Coalition Plaintiffs asserted a right to relief against the University Defendants, and so we are not “left with a definite and firm conviction that the trial court committed a clear error of judgment,” Letherer, 328 F.3d at 266, and affirm the district court’s denial of the University Defendants’ motion.

C. Dismissal of Russell as an Intervenor

Intervening Defendant Russell appeals the district court’s decision granting the Cantrell Plaintiffs’ motion for summary judgment to dismiss him from the case because he no longer satisfied the requirements for intervention. We review de novo a district court’s grant of summary judgment, which “should be granted when the moving party can show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.” Geiger v. Tower Auto., 579 F.3d 614, 620 (6th Cir.2009) (internal quotation marks omitted). We also review de novo district court decisions on motions to intervene as of right, except for the element of timeliness, which is reviewed for an abuse of discretion. Northland Family Planning Clinic, Inc. v. Cox, 487 F.3d 323, 344 (6th Cir.2007). “Because the timeliness element is not in dispute here, we review the entire intervention of right issue de novo.” Id.
At the time Russell originally moved to intervene as of right, he was an applicant to the University of Michigan Law School. With his application pending at the time Proposal 2 passed, Russell was permitted to intervene because he purportedly had an interest in the immediate termination of race-conscious admissions policies, as these policies could theoretically affect his chances of gaining admittance. During the pendency of this litigation, Russell has been denied admission from the University of Michigan Law School, attended and graduated from Wayne State University Law School, and following his graduation, accepted a position as a non-tenured lecturer at Oakland Community College and Oakland University.
Under Federal Rule of Civil Procedure 24(a), an interested party must meet four requirements before being permitted to intervene as of right: (1) his motion to intervene must be timely; (2) he must have a substantial legal interest in the subject matter of the case; (3) he must demonstrate that his interest will be impaired in the absence of intervention; and (4) he must demonstrate that the parties already before the court do not adequately represent his interest. United States v. Michigan, 424 F.3d 438, 443 (6th Cir.2005). An intervenor also must continue to meet these requirements throughout the duration of the litigation, as courts must be able to ensure that parties have a live interest in the case. See Morgan v. McDonough, 726 F.2d 11, 14 (1st Cir.1984) (affirming the dismissal of an intervening party whose legal interest had lapsed because “even if [the party’s original intervention were as of right,] it would have gained no absolute entitlement to continue as a party until termination of the suit”).
Although Russell met all four requirements when he was permitted to intervene, it has become apparent during the *491 course of litigation that Russell can no longer demonstrate that the parties already before the court do not adequately represent his interests. Russell’s burden of showing that “representation of his interests ‘may be’ inadequate” is “minimal,” Trbovich v. United Mine Workers of Am., 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972), however, he still must overcome “the presumption of adequate representation” that arises if he shares “the same ultimate objective as a party to the suit,” United States v. Michigan, 424 F.3d at 443-44. Although the Attorney General’s and Russell’s interests initially diverged — the Attorney General agreed to stipulate to delay the application of Proposal 2, whereas Russell had an interest in Proposal 2’s immediate enforcement— their interests are now aligned. Both now share the same ultimate objective: the validation of Proposal 2. The Attorney General is unquestionably mounting a firm defense of Proposal 2, including a victory in the district court. Any “mere disagreement over litigation strategy” Russell may have with the Attorney General’s defense “does not, in and of itself, establish inadequacy of representation.” Bradley v. Milliken, 828 F.2d 1186, 1192 (6th Cir.1987). Therefore, there is no genuine issue of material fact as to whether the Attorney General adequately represents Russell’s interests. Russell’s intervention in this litigation is no longer proper and we affirm the district court’s grant of the Cantrell Plaintiffs’ motion for summary judgment to dismiss him.
III.
Finding those provisions of Proposal 2 affecting Michigan’s public colleges and universities unconstitutional, we REVERSE the' district court’s judgment granting the Defendants-Appellees’ motion for summary judgment. We further AFFIRM the district court’s denial of the University Defendants’ motion to be dismissed as parties, and AFFIRM the district court’s grant of the Cantrell Plaintiffs’ motion for summary judgment as to Russell.

. It bears repeating that the school board took this step in the absence of a court order or any unconstitutional discrimination whatsoever. The voluntary plan was an ameliorative measure intended to benefit minority students; it was not a protective measure intended to shield minority students from de jure discrimination, which no court had found to exist. See Seattle, 458 U.S. at 460-61, 102 S.Ct. 3187; see also infra Part II.A.3.

. This holds true for enactments that make it more difficult for minorities to use the political process to obtain any sort of legislation that is in their interest — notwithstanding whether one characterizes such legislation as seeking protection against discrimination or, alternatively, preferential treatment. See infra Part II.A.3.

. The Attorney General contends that Hunter and Seattle not only require that the targeted legislation has a racial focus, but that the new legislation be enacted with discriminatory intent. This requirement has no basis in law. To the contrary, the Supreme Court has explicitly rejected such an argument. See Seattle, 458 U.S. at 485, 102 S.Ct. 3187 (“We have not insisted on a particularized inquiry into motivation in all equal protection cases: ‘A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification.' And legislation of the kind challenged in Hunter similarly falls into an inherently suspect category. “)(quoting Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)).

. It is of no consequence that Proposal 2, by its terms, purports to also prohibit preferences based on sex, color, ethnicity, and national origin. As the primary dissent concedes in a self-defeating footnote, the challenged amendment in Hunter also extended *480 beyond race — covering color, religion, national origin, and ancestry as well. Here, as in Hunter, the clear focus of the challenged amendment is race. The history of Proposal 2 and its description on the ballot leave little doubt. Moreover, allowing drafters of racially-focused legislation to evade the protections of the Fourteenth Amendment by nominally including more than one class of individuals would seem to elevate form at the expense of substance.

. At each institution, these boards and their members have slightly differing names — for example, "Board of Trustees,” "Board of Governors,” or "Board of Regents.” Mich. Const, art. VIII, § 5.

. Though the statutes and bylaws cited in this paragraph govern only the University of Michigan, the boards of the other public colleges and universities in Michigan are similarly empowered. See, e.g., Mich. Comp. Laws §§ 390.102-.107 (Michigan State University), 390.641-.645 (Wayne State University). For the sake of clarity, we refer exclusively to the University of Michigan's bylaws and procedures, as they very closely parallel those in place at other Michigan public educational institutions, such as Wayne State University and Michigan State University.

. As the Michigan Constitution grants the power to establish other institutions of higher education beyond the three universities named above, see Mich. Const, art. VIII, § 6, to the extent the leadership of these institutions are democratically accountable, whether tangentially or directly, their powers are part of the political process.

. In holding that Proposal 2 nonetheless does not violate the Equal Protection Clause, the district court asserted that the race-conscious admissions policies at issue here should be distinguished from the voluntary busing program at issue in Seattle because, unlike race-conscious admissions policies, "school desegregation programs are not inherently invidious, do not work wholly to the benefit of certain members of one group and correspondingly to the harm of certain members of another group, and do not deprive citizens of rights.” Coal. VI, 592 F.Supp.2d at 951 (quoting Coal. for Econ. Equity v. Wilson, 122 F.3d 692, 707 n. 16 (9th Cir.1997)). The district court erred in this respect.
Indeed, such a distinction is incompatible with the Supreme Court’s decision in Grutter, and for this reason, we decline to follow Coalition for Economic Equity v. Wilson, 122 F.3d 692 (9th Cir.1997), as the district court did. In Grutter, the Supreme Court showed how narrowly-tailored race-conscious admissions programs are not inherently invidious, see 539 U.S. at 334-44, 123 S.Ct. 2325, and do not work wholly to the benefit of members of one group, see id. at 330, 123 S.Ct. 2325. The Court further explained that “the skills needed in today’s increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints.” Id. Nor are we swayed by Coalition to Defend Affirmative Action v. Brown, 674 F.3d 1128 (9th Cir.2012), which offered only conclusory support for the precedential decision in Wilson.

. Moreover, by definition, we are only addressing valid, constitutional policies; the university boards have no authority to promulgate invalid, unconstitutional policies.

. Because the Plaintiffs’ challenge is limited to public education, we do not decide today whether the portions of Proposal 2 that affect public employment and public contracting also violate the Equal Protection Clause.